556 A.2d 374

COMMONWEALTH of Pennsylvania

v.

Daniel KEAN, Appellant.

COMMONWEALTH of Pennsylvania

v.

Lucile Mae KEAN, Appellant.

Superior Court of Pennsylvania.

Argued May 4, 1988.

Filed March 16, 1989.

588

David P. Truax, Meadville, for appellants.

Douglass W. Ferguson, Assistant District Attorney, Meadville, for Com., appellee.

Before CIRILLO, President Judge, and BECK and POPOVICH, JJ.

BECK, Judge:

This case presents what the trial court described as a "strange search and seizure issue ... which may be unique in the annals of the criminal justice system...." The issue is whether the appellants' rights under the federal and state constitutions were violated when the court refused to suppress a videotape which showed the appellants participating in sexual activities in the bedroom of their home. This videotape had been surreptitiously recorded by two juveniles and was subsequently given to the police by the mother of one of them. The videotape was then viewed by the police without a search warrant. We find that under the Pennsylvania Constitution, appellants had a protected privacy interest in the images which had been secretly captured on the videotape. We conclude, nonetheless, that under all the facts of this case, the police did not act improperly when they viewed the tape without first obtain-

ing a warrant. We therefore affirm the appellants' judgments of sentence.

## I.

In reviewing a trial court's denial of a motion to suppress, we consider the evidence of the prosecution and so much of the evidence of the defense as, read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Lemanski*, 365 Pa.Super. 332, 341–344, 529 A.2d 1085, 1089–1090 (1987); *Commonwealth v. Weik*, 360 Pa. Super. 560, 562, 521 A.2d 44, 45 (1987). Viewed in this light, the facts of the case are as follows.

The appellants, Daniel and Lucile Kean, are husband and wife. They are nearly sixty years of age and for many years they were highly respected members of the community. In 1986, Lucile Kean began to have sexual relations with two male juveniles with her husband's knowledge and approval. The juveniles, Alan and Steve, lived in the same neighborhood as the appellants and were under sixteen years of age when sexual contact was initiated. Alan lived next door to the appellants and resided with his half-sister and her husband, Kevin Kean; Kevin Kean was both Alan's brother-in-law and the appellants' son. Steve lived in a separate residence with his step-father and his mother. On several occasions, Alan and Steve arrived together at the appellants' house and proceeded to have sex with Lucile Kean while Daniel Kean watched.

Eventually, relations between the juveniles and the appellants took a turn for the worse. Alan and Steve borrowed the Keans' car without their permission and then became concerned that the Keans might notify the police. Alan and Steve were also afraid that Lucile Kean might falsely claim that the boys had forced her to participate in their sexual activities. Sometime during the summer of 1986, the boys decided to videotape one of their sexual encounters with the Keans. In this way, they hoped to gather evidence that Mrs. Kean's participation was consensual. They also rea-

soned that they could use the tape to blackmail the Keans into not reporting the unauthorized use of their vehicle.

In order to accomplish their objective, the boys removed a videocamera equipped with videotape from Kevin Kean's home. The camera and tape belonged to Kevin and were taken without his knowledge or permission. The boys then broke into the appellants' house when no one was home and planted the videocamera in the bedroom. They carefully concealed the camera under a pile of clothing so that only the lens protruded, and they focused the lens on appellants' bed. At midnight, the boys returned and were admitted into the house by the appellants. When the boys entered the bedroom, they secretly triggered the camera's recording mechanism before performing sexual acts with Mrs. Kean.

The following day, the boys once again broke into the appellants' home, this time to retrieve the camera. They took the camera back to Kevin's house where they watched the tape and made a duplicate by recording over another videotape which belonged to Kevin. The tape was approximately forty minutes long and showed Mr. Kean lying in bed next to Mrs. Kean while Mrs. Kean had sexual intercourse and oral sex with both Alan and Steve. Alan kept one copy of the tape for himself; this copy was later found by Kevin and erased. Alan gave the other copy to Steve who took it back to his own home.

Alan could not resist screening his copy of the videotape for two of his friends before his copy was erased. Perhaps as a result of this exposure, rumors concerning the existence of the tape began to circulate in the community. Steve's mother, Cherelynn, heard about the tape. When she asked Steve about it, Steve admitted without hesitation that he had his own copy. Cherelynn could not bear to watch the tape herself, so she asked her father Arthur to view the tape and tell her what was on it. Steve, without protest, handed the tape over to Arthur. Arthur took the tape to his house and viewed it on his own videorecorder. He then returned the tape to Cherelynn and informed her of its contents. Cherelynn then contacted a district justice

who told her that the matter was outside his jurisdiction. At this point, Cherelynn placed the tape in her attic where it remained for the next several weeks. She later stated at the suppression hearing: "I wanted to make sure [the tape] got in the right hands, and I didn't know who to turn to." R.R. at 121.

Meanwhile, the Crawford County Children and Youth Services had received an anonymous report concerning the sexual activities of the appellants. The agency referred the matter to Officer Lloyd of the Pennsylvania State Police who interviewed Alan and Steve. Alan and Steve told Officer Lloyd about the tape. On October 24, 1986, Officer Lloyd came to Cherelynn's home and asked her if he could have the tape. Cherelynn voluntarily handed the tape over to Officer Lloyd. At this time, the tape contained no outer markings or labels and it was not possible to examine the contents of the tape with the naked eye. Without first securing a search warrant, Lloyd took the tape to the office of the district attorney where he and the district attorney played it on a videorecorder. After viewing the contents, Lloyd swore out a criminal complaint against the appellants.

Lucile Kean was charged with two counts of involuntary deviate sexual intercourse.[1] In addition, Lucile Kean and Daniel Kean were each charged with two counts of conspiracy to commit involuntary deviate sexual intercourse and two counts of corruption of minors. Defense counsel for the Keans filed a pretrial motion to suppress the videotape which was denied. The Keans were jointly tried before a jury. Alan and Steve testified as Commonwealth witnesses, and the videotape was introduced into evidence and played at trial. On March 17, 1987, appellants were found guilty

---

1. Although there was no contention that the Keans had forced the juveniles to participate in any sexual activities, Pennsylvania law defines involuntary deviate sexual intercourse as including sexual intercourse per os or per anus with a person who is under sixteen years of age. 18 Pa.Cons.Stat.Ann. § 3123 (Purdon 1983). We note that anyone convicted of engaging in involuntary deviate sexual intercourse with a person who is under sixteen years of age is subject to a mandatory minimum sentence of five years imprisonment. 42 Pa. Cons.Stat.Ann. § 9718 (Purdon Supp.1988).

on all counts. Following the denial of post-trial motions, Lucile Kean was sentenced to a total of five to fifteen years imprisonment and Daniel Kean was sentenced to a total of twenty-three to seventy-two months imprisonment. Both parties filed timely notices of appeal from their judgments of sentence and the appeals were consolidated for review by this court.

The Keans raise two issues on appeal: 1) whether the admission of the videotape into evidence violated their constitutional rights; and 2) whether the trial court erred by failing to declare a mistrial after the assistant district attorney allegedly made certain improper and prejudicial remarks during closing argument. We find that the prosecutorial misconduct claim is meritless for the reasons stated in the opinion of the trial court. Trial Court Op. at 5–8. Although the suppression claim requires careful consideration, we conclude that the judgments of sentence must be affirmed.

## II.

Appellants base their challenge to the admission of the videotape on both the fourth amendment of the United States Constitution and on article 1, section 8 of the Pennsylvania Constitution. We begin our analysis by reviewing the scope of these provisions, especially insofar as they relate to the conduct of private citizens.

The fourth amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In his influential concurring opinion in *Katz v. United States*, 389 U.S. 347, 360–62, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967), Justice Harlan interpreted the amendment as prohibiting unreasonable searches of areas and objects in which a defendant manifests a "reasonable expec-

tation of privacy." Harlan defined this phrase with reference to a two-part standard: 1) whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy" and 2) whether this subjective expectation is "one that society is prepared to recognize as 'reasonable' ". *Id.* at 361, 88 S.Ct. at 516. This standard was later explicitly adopted by the United States Supreme Court and is now recognized as the central concept in federal search and seizure jurisprudence. *See, e.g., Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

Article I, section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Like the fourth amendment, this provision has been interpreted as protecting "those zones where one has a reasonable expectation of privacy." *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). *See also Commonwealth v. Blystone,* 519 Pa. 450, 463, 549 A.2d 81, 87 (1988).[2] This court, however, is not bound by fourth amendment precedents when construing claims raised under article 1, section 8. The Pennsylvania Constitution provides broader coverage than its federal counterpart, and an expectation of privacy which is deemed unreasonable by federal courts may be recognized as legitimate in this jurisdiction. *See Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987); *Commonwealth v. Sell, supra* n. 2; *Commonwealth v. DeJohn, supra; Commonwealth v. Beau-*

---

**2.** In *Commonwealth v. Sell,* 504 Pa. 46, 65, 470 A.2d 457, 468 (1983), however, the Pennsylvania Supreme Court expressed concern that the reasonable expectation of privacy standard may not provide sufficient protection against wrongful police conduct. We need not decide whether certain police practices pose such a great threat to privacy that they may violate article 1, section 8 notwithstanding the absence of a reasonable expectation of privacy on the part of the defendant.

*ford,* 327 Pa.Super. 253, 475 A.2d 783 (1984) (extending protection afforded under article 1, section 8 beyond limits of fourth amendment).

█ Nevertheless, both the fourth amendment and article 1, section 8 were designed to serve the same vital function—to prevent government officials from unjustifiably invading the privacy of individuals. Thus, both state and federal constitutional limitations on "unreasonable searches and seizures" apply exclusively to the conduct of persons who are acting as instruments or agents of the state. *Commonwealth v. Goldhammer,* 322 Pa.Super. 242, 469 A.2d 601 (1983), *aff'd* 507 Pa. 236, 489 A.2d 1307, *rev'd sub nom. on other grounds, Pennsylvania v. Goldhammer,* 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985). The federal courts have clearly established that the fourth amendment does not provide a remedy for the victims of unreasonable *private* searches. *See, e.g., Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Similarly, we have held that article I, section 8 does not require the exclusion of evidence wrongfully obtained by a private party. *Commonwealth v. Dingfelt,* 227 Pa.Super. 380, 323 A.2d 145 (1974). *See also Simpson v. Unemployment Compensation Board,* 69 Pa. Commw. 120, 450 A.2d 305 (1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 97 (1983).

█ In the case sub judice, the Commonwealth's chief exhibit was a videotape which would never have been created if not for an extraordinary invasion of the appellants' privacy. This invasion, however, was carried out by two juveniles who were clearly not acting at the behest of any government authority. We conclude that no constitutional violation occurred when Alan and Steve broke into appellants' home and concealed a video camera in the bedroom. Although we in no way condone the juveniles' actions, this

private misconduct did not render the evidence inadmissible.[3]

Appellants, however, maintain that their constitutional rights were infringed by Officer Lloyd, while Lloyd was acting in his official capacity as a police investigator. In their motion to suppress, in post-trial motions, and on appeal to this court, appellants have specifically argued that Lloyd conducted an unreasonable search when he played the videotape on a videorecorder in the District Attorney's Office. This visual inspection of the film was a form of state action and as such was subject to constitutional constraints. We must therefore proceed to determine if this inspection was prohibited by the federal or state constitutions.

## III.

Appellants concede that Lloyd had probable cause to believe that the tape would reveal that appellants had committed several criminal offenses. They claim that Lloyd should have obtained a search warrant before viewing any images on the videotape which could not be seen with the

**3.** We deal here solely with the question of whether the videotape was subject to exclusion under the fourth amendment or under article 1, section 8 of the Pennsylvania Constitution. A state legislature may provide additional protection for personal privacy by enacting legislation which requires the suppression of evidence gathered as the result of an unreasonable search or seizure by private parties. *See Commonwealth v. Murray,* 423 Pa. 37, 51–53, 223 A.2d 102, 109–111 (1966). In this regard, we note that the Pennsylvania Wiretapping and Electronic Surveillance Control Act allows defendants to move for the suppression of tape recordings which were unlawfully intercepted by private citizens. *See Commonwealth v. DeBlase,* 357 Pa.Super. 71, 74, 515 A.2d 564, 566 (1986) (interpreting 18 Pa.Cons.Stat.Ann. § 5721 (Purdon 1983)). Appellants, however, have waived the issue of whether admission of the videotape was contrary to the Act or to any other statute. Moreover, at the time of appellants' trial, the Act defined the word "intercept" as an "[a]ural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." 18 Pa.Cons.Stat.Ann. § 5702. *See Commonwealth v. Beauford,* 327 Pa.Super. at 259, 475 A.2d at 786 (1984). By videotaping the appellants, Alan and Steve did not *aurally* acquire any information; the record indicates that the videotape which Alan and Steve created was purely visual and did not have any sound component.

naked eye. In support of this claim, they primarily rely on *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).

The petitioners in *Walter* owned several hundred pornographic films which were shipped on consignment by a private carrier from St. Petersburg, Florida to Atlanta, Georgia. The carrier misdelivered twelve cartons of films to a private company which had no connection with the petitioners' business. After opening the cartons, employees of the company observed that the films were stored in boxes which were labeled with explicit descriptions of homosexual activities. One employee attempted without success to view the content of the films by holding them up to the light. The company then contacted agents of the Federal Bureau of Investigation who screened several of the films on a projector without the benefit of a warrant. Petitioners were tried and convicted of violating federal obscenity laws and the convictions were overturned by the United States Supreme Court. In the opinion announcing the judgment of the Court, Justice Stevens concluded that "... the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutional interest in privacy." 447 U.S. at 654, 100 S.Ct. at 2400. Thus, the films should not have been admitted into evidence. *See also Stanley v. Georgia,* 394 U.S. 557, 571–572, 89 S.Ct. 1243, 1251–1252, 22 L.Ed.2d 542 (1969) (Stewart, J., concurring) (expressing view that warrantless screening of film violated fourth amendment rights of film owner); *United States v. Haes,* 551 F.2d 767 (8th Cir.1977) (holding that warrantless screening of film violated fourth amendment rights of film owner).

We agree with appellants that if they had a constitutionally protected privacy interest in the videotape, an examination of the videotape by the police with the aid of a videorecorder would have been a search subject to the warrant requirement. However, we must determine at the outset whether appellants had a privacy interest in the videotape at the time it was viewed by Officer Lloyd. As to

this issue, *Walter* offers limited guidance since *Walter* addressed the privacy rights of a film owner. It is undisputed that appellants neither owned the videotape nor were aware of its existence until after it had been removed from their home and repeatedly viewed by private parties.

We shall explore the nature of appellant's privacy interest in the videotape by adopting a three part analysis. In subsection A, we find that appellants had a reasonable expectation of privacy in the place which was videotaped— the bedroom of their home. In subsection B, we find that this expectation of privacy was transferred to the videotape itself at the time of its creation. In subsection C, we consider whether this expectation of privacy was frustrated by events which occurred between the time the tape was created and the time that the tape was examined by the police. We find that appellants' privacy interest in the tape was not substantially eroded when the tape was viewed by private parties before coming into police custody. We conclude, however, that appellants' privacy interest in the tape was extinguished when the mother of one of the juveniles handed the tape over to the police.

## A.

A videotape is a precise visual recreation of events in particular locations. We will consider at the outset whether the location depicted on the videotape which appellants sought to suppress merits constitutional protection.

Although a wide variety of locations may qualify as private for constitutional purposes, including offices and places of business, hotel rooms, telephone booths, and public bathrooms, nowhere is the right to privacy more firmly established than in a private residence. *See generally* Wasserbly, *Pennsylvania Criminal Practice* § 19.03 (1981). "Protection of privacy in the home is the heart of the Fourth Amendment. . . . [T]he [United States Supreme] Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins

of the Republic.'" *Commonwealth v. Lemanski,* 365 Pa. Super. at 347, 529 A.2d at 1092 (citing *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984)). Thus, "[u]pon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to society." *Commonwealth v. Shaw,* 476 Pa. 543, 550, 383 A.2d 496, 499 (1978). Furthermore, if there is any place within the home which must be regarded as an inner sanctum of privacy, that place would be a bedroom shared by husband and wife, since the bedroom is the place primarily associated with the intimacies of married life. *Cf. Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965) (police searches to enforce law against contraception repulsive to notions of privacy surrounding sacred precincts of marital bedrooms).

At the risk of belaboring the obvious, men and women are ordinarily justified in assuming that what happens in the bedroom will not be observed by uninvited spectators. The Commonwealth argues, however, that in the instant case, appellants forfeited their right to privacy when they admitted Alan and Steve into their home. The Commonwealth maintains that "[o]nce [the Keans] engaged in illegal sexual activities with the victims, they had no right to believe the boys would not tell someone what they were doing, or record their activities." Appellee's Brief at 11.[4] We can readily agree that appellants assumed the risk that the juveniles might talk about their sexual experiences. Whether appellants also assumed the risk that the juveniles would plant a videocamera in the bedroom and create a permanent record of these experiences is a far different question.

**4.** The Commonwealth does not argue, of course, that the Keans had no reasonable expectation of privacy simply because they committed illegal acts in their bedroom. If that were the case, the police would have an incentive to invade bedrooms without obtaining a warrant and without probable cause since any criminal evidence uncovered would be admissible at trial, and the privacy rights of law-abiding citizens would be irreparably compromised.

The Commonwealth position is supported to some extent by the recent decision of the Pennsylvania Supreme Court in *Commonwealth v. Blystone, supra.* In *Blystone,* the defendant discussed the details of a murder he had committed with a police informant who had been equipped with a hidden tape recorder. Prior to trial, the defendant unsuccessfully sought to suppress the tape on the grounds that the warrantless recording of his conversation violated the federal and state constitutions. On appeal to the Pennsylvania Supreme Court, five of the seven justices voted to affirm the judgment of sentence.

The *Blystone* majority first noted that the United States Supreme Court has held that wire interceptions with the consent of only one of the parties are not forbidden by the fourth amendment. *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). Turning to the state constitutional question, the majority acknowledged that state courts are free to interpret article I, section 8 as providing a higher level of protection for personal privacy. The majority concluded, however, that once the defendant voluntarily disclosed his secrets to the informant, his words were no longer private and could therefore be recorded without a warrant. *See also Commonwealth v. Rodriquez,* 519 Pa. 415, 548 A.2d 1211 (1988) (following *Blystone* ). In this regard, the Court cited with approval the following passage from Justice White's plurality opinion in *United States v. White:*

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa v. United States,* 385 U.S. [293] at 300–303 [87 S.Ct. 408, at 412–414, 17 L.Ed.2d 374 (1966) ]. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either

(1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez v. United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee v. United States, supra* [343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952)]. If the conduct and revelations made of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

401 U.S. 745, 751, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971) (*cited in Commonwealth v. Blystone,* 519 Pa. at 463, 549 A.2d at 88).[5]

We find, however, that the case sub judice differ significantly from *Blystone,* as well as from the situation discussed in *White.* The Pennsylvania Supreme Court has not previously considered whether the same policies which re-

---

**5.** It is not clear, however, whether the *Blystone* Court adopted Justice White's ultimate conclusion that a defendant has no privacy interest whatsoever in a conversation with a police informant. The Court emphasized that the interception of Mr. Blystone's conversation was specifically authorized by section 5704 of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, and that the Act contains elaborate procedural safeguards designed to protect the rights of the targets of interceptions. *See* 18 Pa.Cons.Stat.Ann. §§ 5704, 5714 (Purdon 1983). The Court further noted that statutes enjoy a presumption of constitutionality, and declared that the Act "strikes a balance between citizens' legitimate expectation of privacy and the needs of law enforcement officials to combat crime." 519 Pa. at 462, 549 A.2d at 86. Thus, *Blystone* may be read as indicating that defendants have a diminished expectation of privacy in conversations with informants and that this attenuated privacy interest was adequately protected by the procedural safeguards of the Wiretap Act. *Cf. Commonwealth v. Phillips,* 373 Pa.Super. 193, 540 A.2d 933 (1988) (indiscriminate interception of conversations would violate article I, section 8, but interception of conversation with police informant in automobile conducted in accordance with Wiretap Act was constitutional).

late to the interception of conversations apply with equal force to the secret filming of events. The Commonwealth argues that there is no relevant distinction between the covert use of audiotape and the covert use of videotape. We cannot agree.

As *White* makes clear, there is no constitutional bar which prevents an informer from writing down a private conversation and later reading his notes in open court. If the informer instead tape records the conversation, an additional element is added—the defendant's voice. A voice is not essentially private in nature; we expose our voices to the general public every day in order to conduct our affairs. Thus, the distinction between transcribing a conversation and recording a conversation is of limited importance.

An informer, of course, is also free to write down a description of events which occur in the defendant's home and to read that description in open court. If the informer instead videotapes his encounter with the defendant, an additional element is added—an image of the interior of the defendant's home. Unlike a voice, this image is a reflection of that which is most private in our society; we do not expose our homes to the general public but only to select guests. Moreover, the image is likely to contain a richness of detail which could not be successfully communicated by even the most articulate of observers. One does not need a law degree in order to understand that a picture is worth a thousand words.

The uniquely invasive nature of surreptitious videotaping is particularly well illustrated by the facts of the instant case. Appellants were videotaped while nude and in bed and while Mrs. Kean engaged in sexual intercourse and oral sex. One can imagine the sense of violation and outrage which appellants must have felt when they learned that the videotape existed. There is something deep in the roots of our civilization which leads us to associate nudity with privacy and to shield our bodies from the uninvited eye. Even many who feel comfortable with openly discussing the details of their sex lives would rebel at the thought of

having sex while being watched by a hidden intruder. One cannot pretend that the Keans would have suffered as great an invasion of their privacy if the juveniles had merely bragged about their exploits. We believe that the Keans expected that whatever else might come to pass, they would not be videotaped in bed, and we believe that society is prepared to recognize that expectation as reasonable.

■ We need express no opinion regarding the impact of the fourth amendment on the present case. We conclude that under article I, section 8 of the Pennsylvania Constitution, a citizen of this Commonwealth may maintain a legitimate expectation of privacy in the home notwithstanding the fact that the interior of the home is secretly videotaped by a guest. We therefore find that the Keans did not waive their constitutionally protected interest in privacy when they admitted Alan and Steve into their bedroom.

## B.

We must next determine whether the appellants' legitimate expectation of privacy in their home attached to the videotape of their home which was introduced into evidence against them. The Commonwealth notes that appellants did not own the videotape they sought to suppress. The Commonwealth also emphasizes that appellants were not even aware that the videotape existed until sometime after it had been removed from their bedroom by Alan and Steve. The Commonwealth would therefore have us conclude, as the suppression court concluded, that appellants had no legal interest in the videotape itself. We could subscribe to this reasoning if the videotape were nothing more than a blank strip of celluloid wound tightly about a plastic reel. Yet, we cannot overlook the fact that the videotape *has a content,* and that this content was a visual recreation of one of the most private things imaginable: appellants' naked bodies in the bedroom of their own home.

■ As we have already noted, a legitimate expectation of privacy ordinarily requires both a subjective expectation of

privacy and a societal recognition that this subjective expectation is justifiable. *See Katz v. United States, supra.* The Commonwealth forcefully asserts that appellants could not have expected that the videotape would remain private since they were not aware that they had been videotaped. To say this is to look only at the surface of things. The value of the videotape as a prosecution exhibit was that it embodied images of and information concerning what went on inside the appellants' residence and it was these images and this information that the appellants sought to keep private when they excluded the general public from their home. Moreover, the very nature of the videotape was such that a screening of the tape was a visual inspection of the home—a visual inspection which was at least as revealing as an actual entry into the home on the night of appellants' crime would have been. For purposes of the law of search and seizure, the videotape cannot be considered wholly apart from the place whose imprint it bears; *an examination of the videotape was a search of the home.* Since appellants had a constitutionally protected privacy interest in the home, we think it follows that this privacy interest could have been infringed upon when the police peered into the recesses of their home by means of playing the videotape.

In urging a contrary conclusion, the Commonwealth relies heavily on the fact that appellants had no proprietary interest in the videotape cassette. Yet, the issue of whether an illegal search has taken place is distinct from the issue of whether the government has interfered with the defendant's right to control his own property. *Cf. United States v. Karo,* 468 U.S. 705, 712–713, 104 S.Ct. 3296, 3301–3302, 82 L.Ed.2d 530 (1984) (common law trespass neither necessary nor sufficient to establish fourth amendment violation). In the landmark case of *Katz v. United States, supra,* FBI agents investigating an illegal gambling operation monitored a phone conversation by placing a recording device on the outside of a public telephone booth. Mr. Katz owned neither the phone booth, nor the phone, nor

the telephone company's transmission wires, yet the Court held that by listening in on his conversation, the government exceeded the limits of the fourth amendment. If a legitimate expectation of privacy can exist in a conversation conducted over a third party's wires, we see no reason why a legitimate expectation of privacy cannot exist in an image projected from a third party's videotape. To require that the defendant own the videotape which bears the image of her naked body in order to assert a privacy claim would be to treat privacy as a commodity that must be purchased, rather than as a central aspect of liberty.

The Commonwealth also stresses that appellants had no idea that they were being videotaped while they were in bed with the juveniles. This is true, but we can safely assume that Mr. Katz had no idea that he was being tape recorded when he placed bets over the public telephone. There is no requirement that in order to demonstrate a legitimate expectation of privacy, a defendant must consciously guard against the precise threat to privacy which materialized. When Katz closed the door of the telephone booth and picked up the phone, he had the right to assume that the police would not later listen to his words on a tape recorder. When appellants admitted the juveniles to their home and closed the door behind them, they had the right to assume that the police would not later watch their images on a videotape.

Finally, although we are aware of no precise analogy to the facts of the case sub judice, we note that the Pennsylvania Supreme Court has implicitly recognized that a defendant may have a legitimate expectation of privacy in an object which is created by a private party and later obtained by the police. In *Commonwealth v. DeJohn, supra,* police investigators served two invalid court subpoenas on a bank: one demanded production of original records relating to defendant's bank accounts, and the other demanded production of *copies* of records and other information relating to defendant's bank accounts. The defendant argued that she had a reasonable expectation of privacy in all of these

documents. Although the United States Supreme Court had previously rejected a similar claim in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Pennsylvania Supreme Court held that article I, section 8 of the state constitution prohibits the warrantless seizure of financial records pertaining to a defendant depositor. In reaching this conclusion, the Court made no effort to distinguish between those papers which the defendants had created and those papers which had been created by the bank. Instead, the Court ordered suppression of all the documents seized, and quoted with approval the following passage from a California Supreme Court opinion:

> Cases are legion that condemn violent searches and invasions of an individual's right to privacy in his dwelling. The imposition upon privacy, although perhaps not so dramatic, may be equally devastating when other methods are employed. Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently, judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devises.

*Burrows v. Superior Court of San Bernadino County*, 13 Cal.3d 238, 247, 118 Cal.Rptr. 166, 172, 529 P.2d 590, 596 (1974) (*quoted in Commonwealth v. DeJohn*, 486 Pa. at 46, 403 A.2d at 1290).

If a depositor has a protected privacy interest in the image of a financial record which a private bank imprints on microfilm, we believe that a home owner can have a protected privacy interest in an image of herself engaging in sexual activities which a private party records on videotape. Today, we heed the *DeJohn* Court's call to keep pace with the threat to privacy engendered by new electronic devices; we act with awareness of the dangers posed by the increasingly widespread dissemination of videocameras and videorecorders among the general public. We hold that appel-

lants had a legitimate expectation of privacy not only in their home, but also in the reflection of their home that the videotape captured and preserved.

## C.

We next consider whether appellants' legitimate expectation of privacy in the videotape was frustrated by the events which occurred between the time that the tape was created and the time that the tape was viewed by the police. As we have noted, Alan and Steve broke into appellants' home and stole the tape. Alan then copied the tape for Steve, and this copy of the tape passed from Steve to his grandfather Arthur, and then to his mother Cherelynn. Cherelynn later voluntarily relinquished possession of the tape to Officer Lloyd. During the time that the tape was in private hands, it was viewed: 1) by Alan and Steve on the videorecorder in Steve's house; 2) by Steve and two friends on the videorecorder in Steve's house; and 3) by Arthur on a videorecorder in his own residence.

The Commonwealth argues that Officer Lloyd did not need to obtain a warrant before playing the tape because the tape had previously been viewed by various private parties. The trial court apparently agreed that the examination of a videotape by a private citizen is sufficient to destroy a constitutionally protected privacy interest.[6] We agree with the trial court's ultimate conclusion that under all the circumstances of this case, Officer Lloyd did not violate the appellants' constitutional rights. However, we base that conclusion on reasoning which differs from the position that was advocated by the Commonwealth and adopted by the suppression court. *See Green v. Juneja,*

---

6. We read the lower court opinion denying appellants' suppression claim as resting upon two alternate grounds: 1) that appellants had no privacy interest in the tape because they did not own the tape and were not aware that they were videotaped; and 2) that any privacy interest that appellants might have had in the tape was destroyed when the tape was viewed by private parties. We addressed the first theory is subsection III(B) of this opinion, and we address the second theory in this subsection.

337 Pa.Super. 460, 487 A.2d 36 (1985) (reviewing court may affirm lower court decision if result correct for any reason).

1.

In *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), the United States Supreme Court first considered whether the examination of a film by private parties may destroy a legitimate expectation of privacy in the film. As we have noted, *Walter* involved an obscenity prosecution of the owners of several cartons of pornographic films which had been mistakenly delivered by a carrier service to the wrong address. *See* slip op. at 379 *supra* (discussing *Walter*). Employees of the company which accidently received the cartons contacted the FBI after opening the cartons and unsuccessfully attempting to view the films. FBI agents then screened the films with a projector without first obtaining a warrant. Although five members of the Court voted to overturn the defendant film owners convictions, the majority could not agree on a common rationale.[7]

In his opinion announcing the judgment of the Court, Justice Stevens found that the FBI's warrantless viewing of the films had violated the defendants' fourth amendment rights. However, he specifically noted that "[s]ince the viewing was first done by the Government when it screened the films with a projector, we have no occasion to decide whether the Government would have been required to obtain a warrant had the private party been the first to view them." 447 U.S. 657 at n. 9, 100 S.Ct. at 2402 n. 9. On the other hand, Justice White did not see any need to reserve this issue. He concluded that a private search does not affect a legitimate expectation of privacy except where that search exposes the contents of a container to the plain view of subsequent observers. Since the exhibition of a film does not expose its contents to plain view, Justice White

7. Justice Stevens authored an opinion announcing the judgment of the Court in which Justice Stewart joined. Justice White wrote a concurring opinion in which Justice Brennan joined. Justice Marshall concurred in the judgment. Since no opinion reflected the views of a majority of the justices, *Walter* is not binding as precedent.

concluded that "a private screening of the films would not have destroyed [the defendants'] privacy interest in them." 447 U.S. at 662, 100 S.Ct. at 2404 (White, J., concurring).

Four years later, in *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court again explored the impact of a private search on subsequent governmental conduct. In *Jacobsen,* a supervisor for the private Federal Express service opened a damaged package and noticed that it contained a white powder. After closing the package, he contacted the federal Drug Enforcement Administration; a DEA agent arrived and reopened the package without securing a warrant. The owners of the package were convicted of possession with intent to distribute a controlled substance (cocaine), and the United States Supreme Court affirmed. Justice Stevens, writing for the majority, reinterpreted *Walter* as standing for the principle that a governmental search infringes a legitimate expectation of privacy only to the extent to which it exceeds the scope of a previous private search. Applying this doctrine, Justice Stevens found that since the DEA agent had merely repeated the actions of the Federal Express supervisor by opening the package, the agent had complied with the fourth amendment.

Justice White concurred in the judgment but did not join the majority opinion. In a concurring opinion, he expanded upon the views which he had previously expressed in his separate opinion in *Walter.*[8]

[T]he mere existence of probable cause to believe that a container or package contains contraband plainly cannot justify a warrantless examination of its contents.

This well-established prohibition of warrantless searches has applied notwithstanding the manner in which the police obtained probable cause. The Court now for the first time sanctions warrantless searches of closed or covered containers or packages whenever probable

8. Justices Brennan and Marshall agreed with the reasoning in this portion of Justice White's opinion. *See* 466 U.S. at 134, 104 S.Ct. at 1667 (Brennan, J., dissenting).

cause exists as a result of a prior private search. It declares, in fact, that governmental inspections following on the heels of private searches are not searches at all as long as the police do no more than the private parties have already done. In reaching this conclusion, the Court excessively expands our prior decisions recognizing that the Fourth Amendment proscribes only governmental action.

. . . .

... The police may, to be sure, use confidences revealed to them by a third party to establish probable cause or for other purposes, and the third party may testify about those confidences at trial without violating the Fourth Amendment. But we have never intimated until now that an individual who reveals that he stores contraband in a particular container or location to an acquaintance has no expectation of privacy in that container or location and that the police may search it without a warrant.

466 U.S. at 129–130, 132, 104 S.Ct. at 1664–1665, 1666 (White, J., concurring) (citations omitted).

Notwithstanding Justice White's reservations, the majority opinion in *Jacobsen* apparently authorizes the warrantless police viewing of films which previously have been examined by private citizens. In the instant case, we may assume arguendo that when Alan and Steve viewed the videotape of their encounter with the Keans, they extinguished any fourth amendment interest which the Keans might otherwise have had in the videotape. However, this does not settle the issue of whether the viewing of the videotape extinguished the Keans' privacy interest under article I, section 8 of the Pennsylvania Constitution. The extent to which the *Jacobsen* doctrine is applicable to claims raised under the state constitution is uncertain.[9]

9. In *Commonwealth v. Kozak,* 233 Pa.Super. 348, 336 A.2d 387 (1975), this court anticipated *Jacobsen* by holding that narcotics agents did not need a warrant in order to reopen a suitcase which had previously been opened by an airline employee. *Kozak* was decided on fourth

One difficulty with extending *Jacobsen* beyond the context of federal law is that its reasoning would seem to conflict with the Pennsylvania Supreme Court's interpretation of the state constitution in *Commonwealth v. DeJohn, supra.* The *Jacobsen* majority built upon the foundation laid by *United States v. Miller, supra,* the case in which the United States Supreme Court held that a depositor has no fourth amendment interest in financial records which he has entrusted to third parties. *Miller* reflects the view that a depositor's legitimate expectation of privacy in checks and other financial documents is destroyed when those documents are examined by third parties during the course of a financial transaction. In *DeJohn,* the Pennsylvania Supreme Court rejected the *Miller* approach and held that under article I, section 8 of the state constitution, a police officer must secure a warrant before obtaining records in the custody of the bank. However, under *Jacobsen,* the bank's own examination of the financial records could be reinterpreted as a "private search" of the records which would justify subsequent warrantless searches by government officials. Thus, *DeJohn* indicates that we must act with special caution rather than apply the *Jacobsen* doctrine indiscriminately to state law claims.

■ In this case, however, we need not determine whether a private search is ordinarily sufficient to destroy a privacy interest protected by article I, section 8. Instead, we must focus squarely upon the extraordinary circumstances of the case sub judice. Appellants were secretly videotaped while engaging in sexual activities in their own bedroom. We hold that appellants' privacy interest in the videotape was not destroyed when the tape was subsequently viewed by a small number of private citizens in a noncommercial setting.

The privacy interest at stake in this case differs significantly from the privacy interest at issue in prior cases involving the search and seizure of films and containers.

amendment grounds and did not address article I, section 8 of the Pennsylvania Constitution.

The object that appellants sought to suppress—the video-tape—was unique in that it directly and graphically revealed the most intimate aspects of their private behavior. Each time the videotape was screened, a window opened through which the observer could peer directly into the appellants' home. Each time the videotape was screened, the appellants' naked, sexually aroused bodies were involuntarily exposed. We do not deal, as in *Walter*, with the privacy rights of defendants who traffic in films which show *other people* engaging in sexual activities. We deal in this case with the right to shield one's own flesh and one's own home from public display.

▮ Bearing all this in mind, we must decide whether the initial private exhibitions of the videotape exhausted appellants' legitimate expectation of privacy in the tape. We think it is clear that to stand naked before the eyes of another is not to stand naked before the entire world. To be forced to disrobe before a stranger is an invasion of privacy; to be forced to disrobe before a second stranger and a third stranger is a further invasion of privacy. To be spied upon by a Peeping Tom while in bed is an invasion of privacy; to be spied upon by a series of Peeping Toms and then by the police is a greater invasion of privacy. We conclude that each time the videotape in this case was examined, appellants' privacy was again compromised.

Finally, we note that the instant case involves privacy concerns which would not be implicated if appellants had agreed to star in a commercially distributed pornographic motion picture. Actors who voluntarily appear in such films have no expectation of privacy in the films because the films are designed to be repeatedly exhibited before the general public. On the other hand, the appellants did not choose to appear in the videotape that the juveniles created; they meant to reveal themselves only to Alan and Steve. Under these circumstances, we cannot justify the warrantless police screening of the videotape on the ground that the videotape had been previously screened by private parties.

614

2.

For all of the reasons discussed above, we reject the Commonwealth's arguments in support of affirming appellants' judgments of sentence. We conclude, nonetheless, that the police did not violate appellants' constitutional rights when they examined the videotape without first securing a warrant. We reach this conclusion by focusing on the manner in which the tape passed from private hands into the custody of state officials.

After Steve brought the videotape into his parents' home, the tape passed into the sole possession of his mother Cherelynn who stored it in her attic for several weeks. She later made what the trial court described as a free and voluntary decision to turn the tape over to the police investigator. Trial Court Op. at 10. Although Cherelynn did not specifically direct the police to screen the tape, she was clearly aware that the police intended to view its contents when she willingly and unconditionally relinquished possession of the tape to Officer Lloyd. Viewed in the light most favorable to the Commonwealth, the prevailing party at the suppression hearing, the record indicates that Cherelynn implicitly consented to Officer Lloyd's subsequent viewing of the videotape. We must therefore consider whether Cherelynn had the power to consent to Officer Lloyd's warrantless search.

Both the federal and state constitutions allow for a third party consent search exception to the warrant requirement. *See Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), *overruled on other grounds, Commonwealth v. Reese,* 520 Pa. 29, 549 A.2d 909 (1988). This exception ordinarily applies in situations in which the defendant permits a third party to have joint access and control over his property and so assumes the risk that the third party will consent to a police search of the property. *See United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Commonwealth v. Van Jordan,* 310 Pa.Super. 516, 456 A.2d 1055 (1983). In the case sub judice, appellants

could not have assumed the risk that Cherelynn would consent to a search of the videotape since they were not even aware that the videotape existed. Nevertheless, in *Commonwealth v. Latshaw,* 481 Pa. 298, 392 A.2d 1301 (1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979), the Pennsylvania Supreme Court recognized that in certain exceptional circumstances, a third party may consent to a search of effects which the defendant did not knowingly place under the third party's control. The instant case is analogous to *Latshaw.*

In *Latshaw,* the defendant asked permission from his friend Robert Hines to store a shipment of marijuana on Mr. Hines' property. Hines allowed the defendant to place the contraband in a barn which was located a short distance away from a farmhouse which Hines rented from his wife's aunt Minnie Bubb. Minnie Bubb also lived in the farmhouse and was the actual owner of both the farmhouse and the barn. Bubb became suspicious of Hines and contacted the police. She asked the police to search the barn, and the police then opened various bags, cartons, and footlockers in which the defendant had stored his marijuana. The defendant argued that he had a reasonable expectation of privacy in these containers and that Bubb's consent to open them was invalid. The Pennsylvania Supreme Court rejected this claim.[10] In his plurality opinion, Justice Nix explained:

In determining what is "reasonable" all the surrounding facts and circumstances must be considered. Here, appellant's purported expectation of privacy is greatly limited by the legitimate interest of Minnie Bubb in the subject property. Accordingly, what distinguishes the present case from other cases which concern the issue of the ability of a third party to consent to a search of the

10. Justice Nix, now Chief Justice Nix, authored a plurality opinion which was joined by Chief Justice Eagen and Justice Larsen. Justice Pomeroy concurred in the result. Although *Latshaw* is not binding as precedent since no opinion commanded the votes of a majority of the justices, *Latshaw* has been cited with approval by prior panels of the Superior Court. *See Commonwealth v. O'Neal,* 287 Pa.Super. 238, 429 A.2d 1189 (1981); *Commonwealth v. Glover,* 266 Pa.Super. 531, 405 A.2d 945 (1979).

property or effects of another party is the utter lack of any consensual relationship between Ms. Bubb and the appellant, coupled with the inescapable fact that Ms. Bubb at no time surrendered any indicia of her absolute control of the barn. Relinquishment of this control cannot be implied from mere sporadic permission granted by Ms. Bubb to her tenant and various others for specific uses. As the undisputed owner of the barn, Ms. Bubb had the unimpeded ability to act at will with regard to the contents of the barn. Absent any express or implied consensual understanding with Ms. Bubb, the appellant had no expectation of privacy with regard to the boxes or their contents placed therein. Ms. Bubb's rights thus were superior to the appellant's rights in the barn and its contents.

481 Pa. at 306–307, 392 A.2d at 1305–1306 (footnote omitted).[11]

■ *Latshaw* indicates that even where the defendant has not voluntarily assumed the risk that a third party will consent to a search, the search may be valid if: 1) the third party has lawfully acquired direct physical control over the objects searched; and 2) the third party has no consensual relationship of any kind with the defendant. These conditions are satisfied in the case sub judice. Cherelynn discovered the videotape in her home and had sole possession of the videotape for several weeks. Moreover, she clearly did not violate any duty to the appellants when she gave the videotape to the police; appellants could not reasonably expect that Cherelynn would harbor the videotape indefinitely. This is not to deny that appellants had a reasonable expectation of privacy in the videotape. However, as in *Latshaw*, this reasonable expectation of privacy was destroyed when a third party with whom the appellants did

11. One might argue that the reasoning in *Latshaw* could have led to a different result in *Walter v. United States, supra.* In *Walter,* the Court did not address the third party consent doctrine, and did not consider whether the private company which received the defendants' packages of films would have been able to consent to the subsequent warrantless search of the films by FBI agents.

not have contact agreed to turn over evidence to the police.[12]

## IV.

In summary, under the Pennsylvania Constitution, appellants had a legitimate expectation of privacy both in their home and in the images on the videotape which was surreptitiously recorded in their home. This privacy interest did not disappear when the videotape was viewed by private parties. However, the subsequent warrantless viewing of the videotape by the police may be justified as a valid third party consent search. Therefore, appellants' constitutional rights were not violated.

The judgments of sentence are affirmed.

CIRILLO, President Judge files a concurring and dissenting statement.

POPOVICH, J., concurs in the result.

CIRILLO, President Judge concurring and dissenting:

I join in Judge Beck's acknowledgment of our supreme court's call to "keep pace with the threat to privacy engendered by new electronic devices." *See Commonwealth v. DeJohn,* 486 Pa. 32, 46, 403 A.2d 1283, 1290 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980). Additionally, I join in sections I, II, III(A), III(B), and III(C)(1) of the opinion, and find them well reasoned. I agree that no constitutional violation occurred when the young boys videotaped appellants, as private conduct does not render evidence inadmissible. I am also of the opinion

12. *Latshaw* does not clearly indicate whether the legitimate expectation of privacy is extinguished as soon as the object in which the defendant has a privacy interest comes under the control of the third party, or only when the third party makes a knowing and voluntary decision to hand the object over to the police. The *Latshaw* Court did not consider whether the defendant could have suppressed the marijuana if the police had entered Minnie Bubb's barn without her authorization. In this case, we do not decide whether the police could have screened the videotape without a warrant if they had obtained the tape without Cherelynn's permission.

that the appellants had a reasonable expectation of privacy in the place which was videotaped, their bedroom, and that this expectation of privacy was transferred to the tape itself at the time of its creation. Moreover, I join in Judge Beck's reasoning that the appellants' privacy interests in the tape were not eroded when various citizens viewed the tape; their legitimate expectations of privacy were frustrated, but not altered. However, I must note my disagreement with the applicability of *Commonwealth v. Latshaw*, 481 Pa. 298, 392 A.2d 1301 (1978), *cert. denied*, 441 U.S. 931, 99 S.Ct. 2050, 60 L.Ed.2d 659 (1979), the case relied upon for the proposition that the officer's screening of the videotape without a warrant fell within the third party consent exception to the warrant requirement. As such, I disagree with the conclusion in section III(C)(2), and hence the result in this case. In my opinion, the search violated the defendants' fourth amendment rights, and the film should have been suppressed.

In *Latshaw*, the Pennsylvania Supreme Court, in a plurality opinion, applied the third party consent doctrine. The court held that the fourth amendment does not preclude a warrantless search of property when consent is given by a person *possessing authority to consent to such search*. 481 Pa. at 303, 392 A.2d at 1304 (Per Nix, J., with two Justices concurring and one Justice concurring in the result). I do not subscribe to the view that the fourth amendment issue in this case can be properly disposed of by reliance upon *Latshaw* or the third party consent doctrine.

The basis for the principle of third party consent is that the consent of one who possesses *common authority over premises or effects* is valid as against the absent, non-consenting person *with whom that authority is shared*. *See United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). In *Latshaw*, Justice Roberts dissented, stating:

The majority concludes that State Police officers lawfully opened, searched, and seized appellant['s] ... closed box-

es and footlockers and their contents, even though no magistrate ever made an independent determination that probable cause supported government intrusion. The majority justifies today's exception from the well-settled warrant requirement of both the federal and Pennsylvania Constitutions on the theory that Minnie Bubb, owner of the bar in which the closed boxes and footlockers were found, but not the owner of these storage containers, could "consent" to the officers' opening of the containers.... *[Appellant] did not in any respect give up the privacy interest manifested upon closing the boxes and footlockers to the outside world.... "So long as a person seeks to preserve his effects as private, even if they are accessible to the public or to others, they are constitutionally protected."*

*Latshaw*, 481 Pa. at 308, 309, 311, 392 A.2d at 1306, 1307, 1308, (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)) (emphasis added).

My colleague states that "[the third party consent] exception ordinarily applies in situations in which the defendant permits a third party to have joint access and control over his property and so assumes the risk that the third party will consent to a police search of the property." Clearly, this is not the situation before the panel in *Kean*. Judge Beck goes on to state: "Nevertheless, in [*Latshaw* ], the Pennsylvania Supreme Court recognized that in certain exceptional circumstances, a third party may consent to a search of effects which the defendant did not knowingly place under the third party's control. The instant case is analogous to *Latshaw*." I disagree, and suggest that these are not the circumstances to which *Latshaw* applies.

Unlike *Latshaw*, the appellants' expectations of privacy were not "greatly limited by the legitimate interest of [the consenting party] in the subject property." *Latshaw*, 481 Pa. at 307, 392 A.2d at 1306. Cherelynn was not the "undisputed owner" of the contents of the film, and thus did not have "the unimpeded ability to act at will with

regard to the contents of the [film]." *Id.* She was merely in possession of the film. Clearly, Cherelynn voluntarily relinquished the film to the officer. However, the fact that the officer may have lawfully been in possession of the film did not give him the authority to search its contents. "An officer's authority to possess a package is distinct from his authority to examine its contents." *Walter v. United States*, 447 U.S. 649, 651, 100 S.Ct. 2395, 2398, 65 L.Ed.2d 410 (1980).

Moreover, I believe it is also important to keep in mind that here, unlike *Latshaw*, we are not dealing with a landlord/tenant situation, to which we can easily resort to concepts of real property law to analyze fourth amendment issues. We cannot say that Cherelynn's rights or interest in the contents of that film "were superior to the appellant[s'] rights...." *Id.*

In my opinion, the case of *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), is more analogous, although it applies federal constitutional law. In *Walter*, twelve cartons of films, each of which bore a drawing suggestive of homosexuality and a description of the film indicating that it depicted homosexual activity, were mistakenly delivered to "L'Eggs Products, Inc.," rather than to "Leggs, Inc." The FBI was contacted, and took custody of the films. The films were then viewed on a projector by FBI agents. The FBI made no attempt to obtain a warrant before screening the films. After an unsuccessful attempt to suppress the films, the defendants were convicted.

The United States Court of Appeals for the Fifth Circuit, over Judge Wisdom's dissent, affirmed. The United States Supreme Court reversed. Justice Stevens, joined by Justice Stewart, concluded that the government's unauthorized screening of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy. The fact that FBI agents were lawfully in possession of

the films did not give them authority to search their contents. Nor did the fact that the boxes had been opened by private parties before they were given to the FBI excuse the failure to obtain a search warrant. 447 U.S. at 654, 100 S.Ct. at 2400.

Justice White, joined by Justice Brennan, concurred in part and in the judgment, agreeing that the government's warrantless projection of the films constituted a search that infringed petitioners' fourth amendment interests even though the government had acquired the films from a private party. *Id.* at 660, 100 S.Ct. at 2403.[1] In Justice White's view, the notion that private searches insulate from fourth amendment scrutiny subsequent governmental searches of the same or lesser scope is inconsistent with traditional fourth amendment principles.[2] *Id.*

In my opinion, Justice White's reasoning is applicable here. I do not believe the third-party consent doctrine is applicable in this case as an exception to the warrant requirement. Even though the officer acquired the film from Cherelyn, a private party, the warrantless projection constituted a search. The search cannot be justified under any of the traditional exceptions to the warrant requirement. The search was not incident to an arrest. There were no exigent circumstances. The search could not be justified under the plain view doctrine. The officer had ample opportunity to secure a warrant from a neutral magistrate. The fact that Cherelyn had the film in her possession was entirely fortuitous; she had no authority to consent to a search of the film. The search, therefore, was unreasonable under these circumstances.

1. In a footnote to the opinion, Justice White disagreed with the suggestion that it is an open question whether the government's projection of the films would have infringed any fourth amendment interest if private parties had projected the films before turning them over to the FBI.

2. Justice Marshall concurred in the judgment. Justice Blackmun filed a dissenting opinion, in which Chief Justice Burger, and Justices Powell and Rehnquist joined.