**[J-20-2014]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 18 WAP 2013 |
| | : |
| Appellant | : Appeal from the Order of the Superior |
| | : Court entered February 27, 2013 at No. |
| | : 1046 WDA 2012, affirming the Order of the |
| v. | : Court of Common Pleas of Mercer County |
| | : entered June 8, 2012 at No. |
| | : CP-43-CR-0001291-2011. |
| | : |
| GERALD M. DUNNAVANT, | : 63 A.3d 1252 (Pa. Super. 2013) |
| | : |
| Appellee | : ARGUED:   April 8, 2014 |


**OPINION IN SUPPORT OF REVERSAL**


**MR. CHIEF JUSTICE CASTILLE**                    **DECIDED: DECEMBER 29, 2014**

The Court granted this discretionary appeal to consider the admissibility at a criminal trial of evidence consisting of a soundless videotape of a drug deal, captured by a hidden camera police placed in the clothing of a confidential informant ("CI"), who met appellee on a pre-arranged street corner for a drug "buy," but was then transported by appellee to appellee's residence, where the CI was invited inside and the drug buy transpired.   The trial court and the Superior Court both held that the videotape was the result of a warrantless search not subject to exception, and therefore, suppression of the videotape was required.   For the reasons that follow, we would reverse.

A series of decisions by this Court some years ago considered the highly analogous circumstances of surreptitious **audio** recordings made by CIs at police instigation in various scenarios – including an unidentified location outside the home, inside a place of employment or business, inside another person's home, inside the

defendant's home at the specific direction of the police, and recordings of a telephone conversation made by police from another location. See discussion *infra*. Remarkably, throughout this litigation, neither the parties nor the courts below have shown any awareness of this developed decisional law. Instead, the parties debate, and the courts below trained their focus upon, whether this case is controlled by observations in a single panel decision of the Superior Court, Commonwealth v. Kean, 556 A.2d 374 (Pa. Super. 1989), appeal denied, 575 A.2d 563 (Pa. 1990) – a case involving a videotape made by a private party, not at the instigation of or with the involvement of police.[1] In contrast, the Kean majority decision itself, written by the Honorable Phyllis W. Beck a quarter century ago, grasped the complexities and identified the relevant authority. Indeed, Kean directly engaged the contemporary law in this area, which was then in its infancy. The opinion ably discussed and distinguished both federal law under the Fourth Amendment to the U.S. Constitution and this Court's then-recent Article I, Section 8 decision in Commonwealth v. Blystone, 549 A.2d 81 (Pa. 1988), aff'd on other grounds, Blystone v. Pennsylvania, 494 U.S. 299 (1990).

In this case, notwithstanding that this Court granted discretionary review to consider the published Superior Court opinion disapproving of a government agent (here, a CI) using a hidden camera to record a drug deal in this scenario, which raises a legal question of obvious importance both to law enforcement and privacy rights in Pennsylvania, the parties have retained their myopic focus on the Kean decision.

---

[1] Kean is the only decision cited in the trial court opinion and in appellee's brief here and in the Superior Court. The Commonwealth likewise focuses upon distinction or reconsideration of Kean, but with a supplemental focus on federal circuit court decisions, which would be on point as a Fourth Amendment matter, if not controlling on the related state constitutional question. The Superior Court's analysis was somewhat more sophisticated, albeit the panel did not engage our cases and ultimately couched its decision solely in terms of Kean's analysis being controlling.

Indeed, the Commonwealth's brief is a virtual reproduction of its Superior Court brief, with the argument itself being entirely *verbatim*. It provides no description, analysis, or criticism of the Superior Court holding and analysis, much less a discussion of what is now a line of decisions proceeding from <u>Blystone</u>. Moreover, in its core substantive point, the Commonwealth asks this Court to distinguish "its" holding in <u>Kean</u>, as though <u>Kean</u> was our precedent and not that of the Superior Court. Appellee's brief, in turn, although adapted for presentation in this Court, makes the same narrow argument as below, reliant upon the purportedly controlling effect of <u>Kean</u>'s observations about privacy where videotaping in the home is involved. Obviously, the advocacy to this Court and correlatively truncated judicial analyses below do not produce optimum circumstances under which to consider and render state constitutional rulings of broad guidance. Nevertheless, and particularly in light of the fact that the intermediate decision below was published and will be of broad effect, and given the absence of nuance or appreciation of relevant cases from this Court,[2] we would proceed to a deliberately narrow decision to reverse and remand, aided by our awareness of the relevant decisions of this Court.

In September 2010, Douglas Loadman, a veteran narcotics agent with eleven years of experience, was working for the Pennsylvania Bureau of Narcotics Investigations and Drug Control, which is a division of the Office of Attorney General. Agent Loadman testified that he was participating in a drug task force investigation with the Southwest Mercer County Regional Police Department; the investigation targeted many individuals,

---

[2] This author has noted that Pennsylvania does not have a "depublication" rule, such as that available by court rule in California, whereby the mischief that may result from obviously problematic published decisions of the intermediate courts can be minimized without the commitment of Supreme Court resources necessary to engage in full corrective review. <u>See</u> <u>Curley v. Wetzel</u>, 82 A.3d 418, 418 (Pa. 2013) (Castille, C.J., concurring, joined by Eakin, J.) ("Such a rule may be salutary, and perhaps the Court should consider adopting a rule of procedure whereby we can correct problematic published decisions of the lower courts by depublication, thus confining errors.").

including one Lindsey Lowe, and used a paid CI to make drug buys. On the afternoon of September 29, 2010, the CI called Lowe to arrange a purchase of crack cocaine, and Lowe instructed the CI to go to the corner of Bond and Beechwood Avenues in Farrell, Mercer County, and meet Lowe's "runner." N.T., 6/6/12, at 4-7.

In anticipation of the drug buy, Agent Loadman placed a covert digital camera on the front of the CI's shirt. The camera was equipped to record black and white video of what was directly in front of the CI, but not sound. Task force personnel also provided the CI with specially marked "buy cash." The camera was activated and a task force member drove the CI nearby to the street corner designated by Lowe. Task force personnel also conducted surveillance, placing multiple officers near the corner where the task force expected the "buy" to take place. N.T., 6/6/12, at 6-8, 12, 43. Agent Loadman, who was part of the surveillance unit, saw the CI proceed to the corner and wait until appellee, who was recognized by some task force members (but not by Agent Loadman), pulled up in a car. The CI was seen entering the front passenger side of the car, and then appellee drove away, followed by members of the task force, to an address that task force members told Agent Loadman was appellee's residence. Agent Loadman then saw the CI and appellee walk up to the residence's porch. The CI entered with appellee and was inside the house for about five minutes, during which time he could not be seen by the task force. The CI then exited the house and was soon picked up by task force personnel, who recovered two bags of suspected cocaine from him, which the CI said had been sold to him by appellee inside appellee's house. Agent Loadman retrieved the camera and downloaded the video onto a DVD. Id. at 11-18.

The videotape captured the following sequence: the trip of the task force driver and the CI to the location; the CI exiting the vehicle; the CI walking to and waiting at the designated corner; the CI entering and riding in a car driven by appellee; the CI exiting the

car and walking with appellee into appellee's residence; the CI and appellee sitting in appellee's living room; appellee leaving the living room, going into another room, returning to the living room, and handing the CI two plastic bags (which were later found to contain 25.2 grams of cocaine); the CI leaving appellee's residence, walking along the street, and being picked up by a vehicle; and the CI being driven away. During this entire period, the CI was under visual surveillance by task force personnel, albeit they obviously could not see inside the residence while the buy was actually occurring. N.T., 6/6/12, at 20-27.

Appellee and Lowe were ultimately arrested on September 8, 2011, pursuant to a warrant based on a probable cause affidavit stating that the covert camera had been used and that its video corroborated the CI's statement that crack cocaine had been bought from appellee inside appellee's residence. Appellee was charged with possessory and drug trafficking offenses, as well as criminal conspiracy.[3]

On February 29, 2012, appellee filed an omnibus pretrial motion alleging that the use of the camera on the CI's person to film him inside his home constituted an unlawful search and seizure in violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 8 of the Pennsylvania Constitution.[4] Appellee therefore sought to have the video recording suppressed.[5] A

---

[3] 35 P.S. §§ 780-113(a)(16) & (30); 18 Pa.C.S. § 903(a)(1).

[4] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article I, Section 8 provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."

hearing was held on June 6, 2012; Agent Loadman testified for the Commonwealth, relating the facts summarized above. The prosecutor also called Corporal Charles Rubano of the Southwest Mercer County Regional Police Department, who stated that he was co-captain of the task force. Corporal Rubano testified that he had conducted surveillance of appellee prior to the date in question, knew appellee's car and residence, and had observed "foot traffic" of people going into appellee's residence, staying for only a few minutes, and then leaving. Corporal Rubano stated that he had believed that this particular transaction would take place on the corner where the CI was told by Lowe to meet his runner, and that the task force had not expected appellee to take the CI into his residence. N.T., 6/6/12, at 35-46.

The trial court issued an opinion and order granting suppression on June 8, 2012. The opinion discussed Commonwealth v. Kean, 556 A.2d 374 (Pa. Super. 1989), one of the few Pennsylvania cases to address covert video recording inside a private residence. As noted, the meaning and reach of Kean was the focus of both parties and both courts below, so a *précis* of the decision is warranted. The video recording in Kean did not involve a police agent or CI entering a home, a hidden police camera, or indeed any police involvement at all in the recording. Rather, in Kean, the defendants were a husband and wife charged with sexual offenses and criminal conspiracy involving the wife's sexual activity with two male juveniles, which occurred with the husband's knowledge, consent, and observation. When the couple's relations with the juveniles

---

(…continued)

[5] Appellee also sought to have the Commonwealth disclose the identity of the CI to the defense. The trial court ordered that if the Commonwealth planned to have the CI testify, the Commonwealth must disclose the CI's identity to the defense at least three weeks prior to trial. The Commonwealth did not challenge this portion of the trial court's order and it is not before the Court in this litigation. See Commonwealth v. Dunnavant, 63 A.3d 1252, 1255 n.1 (Pa. Super. 2013).

soured, the juveniles decided to videotape their future encounters with the wife in hopes of using the tape to extort funds or as proof that the sexual activity was consensual if the wife later claimed otherwise. Eventually, however, one of the juvenile's mothers learned of the tape, obtained it, had a relative watch it, contacted state police, and ultimately turned it over to a state police officer. The officer and the local district attorney viewed the tape. The defendants moved to suppress the tape, their motion failed, and they were both convicted and sentenced to prison.

On appeal, the defendants renewed their challenge to the admissibility of the tape, but a divided panel of the Superior Court affirmed. The lead opinion by Judge Beck, which garnered a majority for virtually all of its substance except for the dispositive conclusion specific to the facts in that case, stressed the need for the judiciary to "keep pace with the threat to privacy engendered by new electronic devices [and] the dangers posed by the increasingly widespread dissemination of videocameras and videorecorders among the general public." 556 A.2d at 384. The opinion began by noting that both the Fourth Amendment and Article I, Section 8 protect areas and objects in which citizens have, in the famous phrasing of Justice Harlan's concurring opinion in Katz v. United States, 389 U.S. 347, 361 (1967), a "reasonable expectation of privacy." However, the Kean opinion noted that Pennsylvania's Constitution "provides broader coverage than its federal counterpart, and an expectation of privacy which is deemed unreasonable by federal courts may be recognized as legitimate in this jurisdiction." 556 A.2d at 377-78.

The Kean opinion emphasized that the purpose of these protections is to "prevent government officials from unjustifiably invading the privacy of individuals. Thus, both state and federal constitutional limitations on 'unreasonable searches and seizures' apply exclusively to the conduct of persons who are acting as instruments or agents of the

state." Id. at 378. Nevertheless, the panel opined that determination of whether a privacy interest exists is a threshold question, and location is a necessary part of that consideration. In that regard, the opinion continued, there is little doubt that the "overriding respect for the sanctity of the home" calls for the highest degree of protection. Id. at 380 (quoting Oliver v. U.S., 466 U.S. 170, 178 (1984) and Commonwealth v. Shaw, 383 A.2d 496, 499 (Pa. 1978)).

Of particular relevance to the present dispute, the Kean opinion recognized that there are counter-considerations, which had been explored in this Court's then-recent opinion in Commonwealth v. Blystone, 549 A.2d 81 (Pa. 1988), a case that considered the constitutionality of Pennsylvania's Wiretap Act (18 Pa.C.S. §§ 5701–5782) when a suspect is audio-recorded by a CI wearing a recording device. The Kean opinion noted Blystone's review of notable U.S. Supreme Court cases and the resulting central point that, once a person voluntarily discloses incriminating information or actions in a conversation with another person, the risk exists that the other person may inform law enforcement or may be recording the exchange; correspondingly, there may be a "diminished expectation of privacy" in such interactions. 556 A.2d at 380-81 & n.5.

Kean opined that surreptitious video surveillance in the home was "uniquely invasive," more so than audio recording; that the Keans had a reasonable expectation of privacy in their bedroom; that they did not waive it by previously bringing the boys into their bedroom; and that the invasion of privacy by the two teenagers and their video camera, although not directed or on behalf of police or other law enforcement authority, was "extraordinary." 556 A.2d at 378, & 381-82. Ultimately, however, the Kean court found that the videotape was admissible, reasoning that when the mother of one of the boys voluntarily turned the tape over to police, the transfer amounted to a valid third party consent, and the action of the police and prosecutor in merely viewing the tape thereafter

was not an unconstitutional search or seizure. 556 A.2d at 386-89. Judge Zoran Popovich concurred in the result without opinion, thus providing the second vote for the mandate denying relief. 556 A.2d at 375-89.

In a concurring and dissenting opinion, President Judge Vincent A. Cirillo agreed with the bulk of the lead opinion's substantive constitutional analysis, but disagreed with the dispositional point as to third party consent. In his view, the possession of something by the police does not equate with a constitutional authority to examine its contents. Judge Cirillo would have concluded that the defendants' Fourth Amendment rights were violated, notwithstanding the absence of a governmental search or seizure. Id. at 389-91 (Cirillo, P.J., concurring and dissenting). This Court denied allocatur. Commonwealth v. Kean, 575 A.2d 563 (Pa. 1990).

Here, the trial court focused on the emphasis in Kean as to the privacy right in one's home, particularly Kean's assertion that "nowhere is the right to privacy more firmly established than in a private residence," and that the defendants "had a legitimate expectation of privacy not only in their home, but also in the reflection of their home that the videotape captured and preserved." Trial Ct. Op. at 5 (quoting Kean).[6] The trial court then concluded that appellee did not forfeit his right to privacy by the act of inviting the CI into his residence for the drug buy. The court recognized that a host who invites someone into his home risks that the person may relate to others what was seen or done in the home. But, in the trial court's view, that understanding does not entail an expectation that the invitee will covertly videotape the interior of the home or his

---

[6] As described above, Kean's broad language represented an exposition of the Pennsylvania Constitution's greater protection of privacy, and the trial court here relied on Kean exclusively. But, the trial court did not note the distinction in the two charters and, evidently and incongruously, viewed the question before it as one implicating the Fourth Amendment alone.

experience inside. The court deemed the facts here to be "even more offensive to the Fourth Amendment than [those in] Kean." This was so, the court reasoned, because the videotaping in Kean was not at the behest of law enforcement with the intent to use any resulting incriminating evidence. The court then rejected as "bootstrapping" the Commonwealth's separate assertion that, because appellee sold drugs from his home, it was a place of business entitled to a lesser degree of privacy. Id. at 6-7 & n.2.

The Commonwealth appealed to the Superior Court, certifying that the order of suppression substantially handicapped its prosecution. The Commonwealth argued that because appellee freely invited the CI into his home to engage in the drug transaction, there was no unconstitutional invasion of his privacy. The Commonwealth added that, because the CI could testify as to what he or she saw (although the Commonwealth was reluctant to expose the identity of the CI), the silent videotape of the same place and events should be admissible. The Commonwealth noted the age of the Kean case, advances in technology, and a supposed absence of guidance from this Court, then asked the Superior Court to reassess Kean in light of the facts *sub judice*.

The Commonwealth also argued that Kean is inapposite since the videotape in that case was of sexual activity in a bedroom, which implicates a substantial expectation of privacy. The Commonwealth contrasted this case, where appellee freely invited the CI into his residence for the sole purpose of a drug sale which, the Commonwealth argued, operated to forfeit any reasonable expectation of privacy appellee would otherwise have had; the camera worn by the CI recorded only images from the room into which the CI was invited; the only images captured were actions that appellee knowingly and intentionally exposed to the CI; and when the CI left, the camera left with him. The Commonwealth also stressed that neither the CI nor the police knew that the CI was going to be invited into appellee's residence: rather, the purpose of outfitting the CI with

the camera was to record the drug sale on the public street corner where appellee went freely to meet the CI.

The Commonwealth asserted that this scenario appeared to present a question of first impression in Pennsylvania,  citing federal circuit court cases as persuasive authority for the point that video surveillance by a CI invited into a defendant's home does not violate the Fourth Amendment.   Those cases held that an individual forfeits privacy interests by inviting a person who turns out to be a CI into his or her home and exposing his or her activities to that person, who uses a hidden camera to record those activities. See U.S. v. Brathwaite, 458 F.3d 376, 380-81 (5th Cir. 2006) (once Brathwaite invited CI into his home, he forfeited privacy interest in activities exposed to CI, who had hidden camera in her purse); U.S. v. Lee, 359 F.3d 194, 201 (3d Cir. 2004) (opinion by Judge, now-Justice, Alito holding that warrantless video recording by CI did not violate Fourth Amendment because no expectation of privacy exists in actions or statements that defendant willingly exposes to CI); U.S. v. Davis, 326 F.3d 361, 366 (2nd Cir. 2003) (no Fourth Amendment violation where CI was inside residence with Davis's consent and portable hidden camera in CI's jacket merely memorialized what CI was able to see as invited guest).[7]   Commonwealth's Superior Court Brief, at 7-13.

Appellee responded that suppression was proper because the covert filming by the CI was a government search undertaken without a warrant or express consent, and no exception to the warrant requirement applied.   Appellee asserted that there was no reason why the Kean court's observation respecting the strong right to privacy in one's home should not counsel suppression here, even if the covert taping here was by an invited guest.   Appellee also echoed the trial court's emphasis on the fact that the

---

[7] Brathwaite was remanded to the district court on other grounds, resulting in no further available history, and the U.S. Supreme Court denied *certiorari* in Lee and Davis.   Lee v. U.S., 543 U.S. 955 (2004); Davis v. U.S., 540 U.S. 908 (2003).

videotaping was by a CI, a *de facto* government agent, and was meant to be used against appellee in a criminal prosecution, and thus the case for suppression should be stronger than in <u>Kean</u>'s private invasion of privacy scenario. Appellee's Superior Court Brief, at 3-6.

In a unanimous published opinion, a panel of the Superior Court affirmed. <u>Commonwealth v. Dunnavant</u>, 63 A.3d 1252 (Pa. Super. 2013). The panel summarily dismissed the Commonwealth's citation to federal circuit court decisions that addressed video surveillance because "federal opinions are not binding on this Court." <u>Id.</u> at 1255 n.2. The panel noted the sound proposition that Article I, Section 8 affords greater protection of individual privacy than the Fourth Amendment, and quoted <u>Kean</u>'s statements to that effect. But like the trial court, the panel proceeded to its analysis as if the two are coterminous, perhaps in light of <u>Kean</u>'s explanation that both provisions seek to prevent law enforcement conduct that invades an individual's reasonable expectation of privacy without justification or a warrant to do so. The panel then engaged the <u>Kean</u> issue on the terms presented to it by the parties: *i.e.*, was <u>Kean</u> distinguishable, and if not, should it be reassessed. The panel declined to reassess <u>Kean</u>, noting that despite its age, this Court had denied allocatur, and thus the decision "remains controlling law on the subject of a defendant's 'legitimate expectation of privacy not only in their [sic] home, but also in the reflection of their home that [a] videotape capture[s] and preserve[s].'" 63 A.3d at 1256 (quoting <u>Kean</u>, 556 A.2d at 384).

On the merits, the panel block-quoted the trial court's reasoning that appellee had not forfeited his right to privacy by inviting the CI into his home, and noted its agreement with that analysis. The panel then noted that "as in <u>Kean</u>," the question before it was whether appellee "has a privacy interest in not being videotaped secretly in his own home"; that, when government agents are involved, the question is a constitutional one;

that while Pennsylvania decisional law has construed the state charter as providing a heightened expectation of privacy, both Article I, Section 8 and the Fourth Amendment guard against law enforcement conduct that results in unjustifiable invasions of privacy; and that the warrantless search represented by the videotape here did not fall within any recognized exception to the warrant requirement. The panel then dismissed the various distinctions of Kean offered by the Commonwealth, stating that "even if the Commonwealth's video recording inside the defendant's living room was 'inadvertent,' we hold that it was an unconstitutional invasion of the defendant's expectation of privacy in his home." Id. at 1256-57.

This Court granted the Commonwealth's petition for allowance of appeal to address the following question: "Whether the suppression court erred by suppressing at trial evidence obtained by the use of a silent video camera worn by an informant inside of respondent's residence." Commonwealth v. Dunnavant, 73 A.3d 524 (Pa. 2013). The Court's review is restricted to examining whether the record supports the suppression court's factual findings, while maintaining *de novo* review over the suppression court's legal conclusions. Where the suppression facts are disputed, we consider the evidence from the prevailing party's witnesses along with any uncontroverted evidence of the opposing party. Commonwealth v. Brown, 996 A.2d 473, 476 (Pa. 2010). In this case, there is no dispute over the operative facts, and the disputed question is one of law; the Court's review, then, is plenary.

As indicated above, the Commonwealth reprises its position from below exactly; indeed, it appears that the Commonwealth has filed the same brief it filed in the Superior Court. Even though the Commonwealth is the appellant here, there is no mention of the Superior Court panel's decision (from which it appeals), and no discussion of Pennsylvania law in this area as contrasted with federal law, except to the extent that the

Commonwealth reprises its citations to federal circuit court decisions where video surveillance was at issue. Commonwealth's Brief at 9-13. For present purposes, the aspects of the Commonwealth's briefing that matter (given the audio recording precedents of this Court) are that the CI was equipped by police with the wearable camera for the purpose of recording a drug buy that both the police and the CI expected to transpire on a public street corner, and was not purposefully sent by police to appellee's home. Then, at the prearranged corner, unexpected to the police, appellee picked up the CI in his car, drove the CI to his own home, and brought the CI inside. The surreptitious filming of the drug deal then occurred in appellee's home.

Appellee's brief, though not a *verbatim* reproduction of his filing in the Superior Court, nevertheless forwards the same focus as below. Thus, he argues that suppression was proper since there was no basis to find that he relinquished his reasonable expectation of privacy because he could not have reasonably expected that the person he invited into his home was a CI wearing a hidden camera. To appellee, if such "untrammeled" government activity is permitted without a warrant based upon probable cause, the right to privacy in the home will be threatened; and citizens' reasonable expectation of privacy in the home must be protected from what appellee calls "repugnant" government intrusion without probable cause.

To better focus the issue we note some preliminary points. First, as noted, neither party argues the case in terms of the distinctions between federal constitutional law and Article I, Section 8. Rather, both accept Kean as the governing constitutional decision, and argue from that platform with no additional analyses specific to the Pennsylvania constitutional experience. Second, the evidence here involves video images alone,

without audio.  Since no "communication" was intercepted, the Wiretap Act[8] is not at issue facially, nor do the parties argue that it applies; this appeal thus raises a strictly constitutional query involving the hidden video camera.  Third, there is no suggestion that the CI's entry into appellee's home was unlawful: he was invited across the threshold by appellee, who drove him there from the pre-arranged street corner.  There was no breaking of doors, or evidence that the CI rummaged about the home once inside.  Fourth, appellee has not suggested that there is anything unlawful in a police agent, such as a CI, using a hidden camera to record evidence *per se*.  Thus, for example, appellee does not argue that if this pre-arranged drug sale had occurred, and was surreptitiously filmed, on the street corner where appellee and the CI met, suppression would still be warranted.  Instead, appellee's argument for suppression focuses on the fact that the video recording occurred in his home, without his knowledge.  And, finally, appellee has never alleged that the police employed a ruse designed to invade the privacy of appellee's home in order to defeat the warrant requirement.  Instead, the situation, and the Superior Court's ultimate holding, appears to have engendered a *per se* rule: absent a warrant, neither police nor a police agent may use a hidden camera in a suspect's home, regardless of how the camera arrives there.

Notwithstanding the exclusive focus of the parties and courts below on the Kean decision, we do not view Kean as a particularly helpful starting point.  For one thing, the factual circumstances in Kean – non-police actors deliberately invading the privacy of the defendants' bedroom to set up a video camera to record all of the events therein, with police involvement consisting only of viewing the privately-recorded tape after one of the

---

[8] 18 Pa.C.S. §§ 5701–5782.  Generally speaking, the Wiretap Act criminalizes purposefully "intercepting, using, or disclosing private communications except pursuant to specified procedures." Karoly v. Mancuso, 65 A.3d 301, 304 (Pa. 2013); see also Commonwealth v. Arrington, 86 A.3d 831, 858-60 (Pa. 2014) (Castille, C.J., concurring).

boy's mothers voluntarily gave the video to a state trooper – are not particularly relevant to the situation here, where a CI was deliberately outfitted by police with a hidden camera on his person for purposes of recording a drug buy outdoors and in public, but who then was unexpectedly taken to and inside the drug dealer's home to complete the buy. And, moreover, the core of the broad and dramatic language from <u>Kean</u> seized upon below -- that "nowhere is the right to privacy more firmly established than in a private residence" -- is unexceptional. It is beyond dispute that the right to privacy has its greatest power in the home, and this has been part of our legal tradition for centuries. <u>See</u>, <u>e.g.</u>, <u>Miller v. U.S.</u>, 357 U.S. 301, 306-07 (1958) ("From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle.") (footnote omitted). And, the sanctity of the home can be implicated by many forms of conduct amounting to "searches," from observations by the naked eye, to recordings and to physical searches, to name only a few.

The parties no doubt seized upon <u>Kean</u> because they could find no Pennsylvania cases from this Court involving cameras deployed in a suspect's home on the person of a CI or other police agent – much less cases where the encounter was expected to take place elsewhere in public, and entry into the home by the CI resulted from an unexpected invitation by the defendant. What the parties and the courts below should have found, however, is a line of cases from this Court arising in the obviously analogous circumstance of warrantless audio surveillance, jurisprudence spanning over a decade. Indeed, given that <u>Kean</u> discussed the first case in this line, <u>Commonwealth v. Blystone</u>, from 1988, the failure to perceive the relevance of these cases is inexplicable. We think an exploration of the reasoning developed in the cases is therefore helpful in framing the decisional inquiry here.

In the audiotaping cases, this Court has divided on two distinctly articulated constitutional viewpoints. On one hand, several Justices have reasoned that a defendant who voluntarily reveals incriminating information or actions to another person runs the risk of it being revealed to authorities, whether by oral recounting or by electronic recording and transmission, and therefore surrenders any reasonable expectation of privacy in those expressions or actions, wherever they may take place. That position was represented by the 5-2 majority in Blystone, the Court's first encounter with this issue. Other Justices, beginning with the dissenters in Blystone, have maintained that Pennsylvania's tradition of providing greater constitutional protection of privacy than does the Fourth Amendment means, in this area, that any form of governmental or law enforcement "eavesdropping," even with the consent of one party (like a CI), cannot be reasonable. A more modest view of that position achieved majority support, by a 4-3 vote, in Commonwealth v. Brion, 652 A.2d 287 (Pa. 1994), where the Court stressed that the audio recording occurred because police deliberately sent a CI wearing a wire to the defendant's home.

Blystone was a capital murder in which the Court upheld the admission at trial of a recorded conversation between Blystone and a police informant, who had consented to wear a wire. During that conversation, Blystone incriminated himself in the murder of the victim. On appeal, Blystone argued that the audio recording, though authorized under the Wiretap Act and consented to by the informant, nevertheless violated his rights under Article I, Section 8 of the Pennsylvania Constitution. The majority opinion by Mr. Justice McDermott noted that the question was settled that one-party consensual interceptions do not violate the Fourth Amendment, but also stressed that the federal precedents did not necessarily control the state constitutional analysis, since the states are free to interpret their charters more broadly. Nevertheless, the Court concluded that the key

inquiry remained the same as under Fourth Amendment principles: *i.e.*, whether the defendant could claim a "reasonable expectation of privacy" that was violated by the challenged action: "To determine whether one's activities fall within the right of privacy, we must examine: first, whether appellant has exhibited an expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable." 549 A.2d at 87 (citing Katz v. U.S., 389 U.S. 347, 360 (1967) (Harlan, J., concurring) (use of "pen register" to listen to and record words spoken by defendant in phone booth violated expectation of privacy that was both subjective (personal) and objective (societal)).

The Court cited and quoted a number of U.S. Supreme Court opinions for the premise that one takes the risk, when disclosing criminal actions or statements to another person, that the other person may be a CI and may be recording and transmitting the contents of the conversation to authorities. See U.S. v. White, 401 U.S. 745 (1971) (plurality) (CI wearing audio recorder and transmitter able to capture drug sales being arranged: "Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police."); Hoffa v. U.S., 385 U.S. 293 (1966) (no violation to use testimony of CI who engaged in or overheard conversations in which defendant implicated himself: no protection for misplaced belief, confidence, or reliance that one to whom wrongdoing is voluntarily disclosed will not divulge information to law enforcement); and Lopez v. U.S., 373 U.S. 427 (1963) (no violation to use recording obtained by CI wearing audio wire when invited into defendant's office to hear offer of bribery); see also U.S. v. Lewis, 385 U.S. 206 (1966) (if defendant invites "outsiders" into home for purpose of illegal narcotics sales, no constitutional violation of privacy; risk is taken in doing so that one's "customer" may be a CI).

The Blystone Court emphasized that, under those federal cases, there is no constitutionally protected expectation of privacy in the context of a voluntary disclosure of criminal activity to another person:

> Basically, the [U.S.] Supreme Court has recognized the simple fact that a thing remains secret until it is told to other ears, after which one cannot command its keeping. What was private is now on other lips and can no longer belong to the teller. What one chooses to do with another's secrets may differ from the expectation of the teller, but it is no longer his secret. How, when, and to whom the confidant discloses the confidence is his choosing. He may whisper it, write it, or in modern times immediately broadcast it as he hears it.

549 A.2d at 87-88. Referring back to the White case, the Blystone Court added that the plurality there had stressed:

> Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat of injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.

Id. at 88 n.18 (quoting White, 401 U.S. at 753). Although reaffirming that the Court was not bound to follow federal law, the Blystone Court stated that it was "persuaded by the rationale behind those [U.S. Supreme Court] decisions," and thus, there was no "constitutional defect" in the Wiretap Act, which allowed the interception. Id. at 88. The Blystone majority, then, exemplifies the first approach noted above: in assessing

expectations of privacy, disclosure entails the risk of not only being heard, but of being reported or recorded.

Mr. Justice Zappala, joined by Mr. Justice Larsen, issued a dissent in Blystone, articulating a view representing the second approach discussed above: a person's confidence in another is unconstitutionally betrayed by electronic "eavesdropping," even if the other person consents to wear a wire or otherwise facilitate the interception. The dissent argued against what it called the majority's "blind adherence" to the U.S. Supreme Court's Fourth Amendment precedent. The dissent argued for elevated protection of privacy as a "paramount" concern and right under the Pennsylvania Constitution, which would be little more than a "useless ideal" if it could be waived by the mere fact of having a conversation with another person. The dissent would have required, prior to the use of any technological or mechanical means of intercepting communications, that a disinterested and objective judicial officer determine probable cause and issue a warrant. As such, the dissent would have struck down the Wiretap Act as unconstitutional to the extent that it permitted warrantless interception by "any investigative law enforcement officer or any person acting at the direction or the request of an investigative or law enforcement officer." Id. at 103-07 (Zappala, J., dissenting, joined by Larsen, J.).

It is notable that the neither the majority nor the dissent in Blystone couched its analysis in terms of the location where the conversation was intercepted: indeed, neither opinion noted where the audio recording took place (*i.e.,* as relevant for present purposes, whether it was in a physical location where the defendant had a particular expectation of privacy). Rather, five Justices viewed the fact of Blystone's disclosure to the informant as alone defeating any reasonable expectation of privacy in the things he said, however they were intercepted (by the CI's ears or by being recorded); and two

Justices maintained an equally basic position that, absent mutual consent or a judicial warrant, electronic interception and recording violated the Pennsylvania Constitution.

In Commonwealth v. Rodriguez, 548 A.2d 1211 (Pa. 1988), a companion case decided the same day as Blystone, the same 5-2 majority applied Blystone to somewhat different circumstances. In Rodriguez, the CI consented to wear a body wire. At the meeting with appellant and another man in an apartment (it is not clear from the opinion whether it was appellant's or someone else's residence), the CI purchased methamphetamine from appellant; the transaction was audio-transmitted and recorded by police, and appellant was ultimately convicted of one count of selling controlled substances. On appeal, appellant challenged the interception under both the Fourth Amendment and Article I, Section 8. In a brief majority opinion, Justice McDermott stated that under U.S. Supreme Court authority such as White and Lopez, which were both discussed in Blystone, one-party consensual interception does not violate the Fourth Amendment, and that under Blystone's approach, nor does such interception (in conformance with the Wiretap Act) violate Article I, Section 8. 548 A.2d at 1212-14. The two Blystone dissenters dissented for the reasons set forth in the Blystone dissent. Id. at 1214 (Zappala, J., joined by Larsen, J., dissenting). As in Blystone, neither opinion discussed or placed any particular relevance on the location where the recording took place.

In later cases further described below, however, Justice Zappala, the author of the Blystone dissent, described and distinguished Blystone as a situation where "the police were able to obtain an audio tape of Blystone describing the murder to an informant who along with Blystone was in a truck when police monitored and recorded the conversation." Brion, 652 A.2d at 288 (citing Blystone, 549 A.2d at 99); see also Commonwealth v. Schaeffer, 688 A.2d 1143, 1146 (Pa. 1993) (Opinion in Support of Affirmance ("OISA") by

Zappala, J., joined by Flaherty and Cappy, JJ.). Mr. Chief Justice Nix, who had joined the Blystone majority, responded in both Schaeffer and Brion that the locational distinction so articulated had no basis in the Blystone opinions or analyses. In his Opinion in Support of Reversal ("OISR") in Schaeffer, Chief Justice Nix explained:

> The [OISA] fails in its attempt to distinguish the instant facts from those facts in Blystone; Blystone's expectation of privacy was lost not because Blystone was not in his home, but because he elected to divulge his participation in the crime to an informant. Neither the majority nor the dissenting opinion in Blystone contains any reference to the location of the conversation, nor do they rely on that factor to decide the case. Where the [OISA] notes that the Blystone decision turns on the location of the conversation, it supports that contention with a citation to the appendix to the opinion (containing a transcript of Blystone's conversation) rather than a citation to the bodies of the majority or dissenting opinion. Indeed, in this case, the [OISA] summarizes the Blystone holding without any reference to the location of the conversation, but instead acknowledges that there was "no constitutional defect in the statute because Blystone had no reasonable expectation of privacy *once he chose to disclose his confidence to the informant.*" *Supra,* slip op. at 1146 (emphasis added). Thus, the location is not a distinguishing factor because it was not a consideration in the original Blystone decision.

688 A.2d at 1148 (OISR by Nix, C.J., joined by Larsen and Papadakos, JJ.) (italics in original). Accord Brion, 652 A.2d at 290 (Nix, C.J., dissenting, joined by Papadakos and Castille, JJ.) (same).

In neither case did Justice Zappala respond to Chief Justice Nix. Review of Blystone itself confirms that the cite to Blystone to support the Schaeffer majority's locational distinction was not to either Blystone opinion, but to an Appendix to the Blystone majority that consisted of a transcript of the recorded conversation, in which the CI stated: "Wait until I throw this s--- into the back of the truck, man." There is no indication elsewhere in the reproduced transcript as to whose truck it was, where they

were, or what they were doing other than eating French fries and apple pie. See Blystone, 549 A.2d at 94-96 (Appendix).

The Schaeffer case resulted in a *per curiam* affirmance by operation of law, with the six-Justice Court divided evenly.[9] Justice Zappala's OISA stated the issue there as: "whether, under the Pennsylvania Constitution, the police can send a confidential informer into the home of an individual to electronically record his conversations and transmit them back to the police." 688 A.2d at 1144. The police in Schaeffer employed the CI to make a controlled purchase of marijuana in the defendant's home; equipped the CI with a body transmitter; directed him to the defendant's home to make the purchase, and then monitored and recorded the ensuing exchange. The OISA, explaining why it would find the recording unconstitutional under Article I, Section 8, distinguished Blystone as noted above, *i.e.*, because Blystone did not involve a recorded conversation within the home. To the OISA, "[i]f nowhere else, an individual must feel secure in his ability to hold a private conversation within the four walls of his home." Continuing, the OISA quoted language from Commonwealth v. Shaw, 383 A.2d 496, 499 (Pa. 1978): "Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society." Schaeffer, 688 A.2d at 1144-47. The OISA concluded: "[b]ecause the right to privacy in one's domain is sacrosanct, we hold that Article I, § 8 of the Pennsylvania Constitution precludes the police from sending a confidential informer into the home of an individual to electronically record his conversations and transmit them back to the police." Id. at 1144.

Chief Justice Nix's OISR tracked the approach in the Blystone majority and the Court's extension, without comment, to a private residence in the companion Rodriguez case. Thus, in the OISR's view, Schaeffer could have no reasonable expectation of

_____

[9] Mr. Justice Montemuro did not participate in either the consideration or decision.

privacy as to being recorded once he exposed his criminal conduct to another person, regardless of where the disclosure occurred.  Id. at 1147-49.  Also, as noted above, the OISR critiqued the OISA's factual distinction of Blystone as being premised upon a circumstance not discussed by the competing opinions in Blystone.  Id. at 1148.  The OISR then stressed Rodriguez, arguing that even if Rodriguez did not specify that the apartment was the defendant's own residence, nonetheless, a majority held in the case that the Blystone majority **rationale** permitted surreptitious recording in a residence by a consenting CI wearing a wire.  Finally, the OISR noted that the premise of heightened protection of privacy in one's home may also be in question when the "home" is also used as a place of business to sell a product (marijuana) to members of the general public.  Id. at 1148-49 & n.2.

The Schaeffer OISR was joined by Justices Larsen and Papadakos, each of whom issued a separate OISR as well, which expanded on the view that the privacy of one's home may be compromised when one chooses to conduct business, particularly illicit business, from the residence.  According to Justice Papadakos, "[Schaeffer] did not close his door to the outside world.   Rather, he opened it to customers who came into his 'drug' store for the express purpose of purchasing drugs in violation of our drug laws."  Justice Papadakos added that the use of CIs had become common in law enforcement; thus, a drug dealer who believed that doing business in his home shielded him from a CI's testimony (with or without audio recording) would be, at the least, "foolhardy," and likely not able to show an actual subjective expectation of privacy.  Id. at 1149-52.   On reargument, the Court, with a new composition, again divided 3-3, resulting in a *per curiam* affirmance.  Commonwealth v. Schaeffer, 652 A.2d 294 (Pa. 1994).

A year after the original Schaeffer division, a full Court was available to consider a similar question, however, in Commonwealth v. Brion, as mentioned above.   Writing for a

4-3 majority, Justice Zappala tracked the position from his OISA in Schaeffer, and held that the "sacrosanct" right to privacy in one's own home, protected by the Pennsylvania Constitution, barred police from "sending" a CI wearing an audio wire into the home of a suspected drug dealer, even if the CI was invited inside by the suspect. Brion explained that the constitutional violation consisted of the deliberate police invasion into the sanctity of Brion's home "sending" the consenting wire-wearing CI to the suspect's home posing as a customer. At the same time, Brion stressed that the central holding in Blystone remained the law, explaining that, "[w]e found no constitutional defect in [the Wiretap Act] because Blystone had no reasonable expectation of privacy once he chose to disclose his confidence to the informant." But Brion then reemphasized, as had Schaeffer, the different calculus where police conduct invades the privacy of the home, repeating the same dramatic phrasing from Shaw that was emphasized in the Schaeffer OISA: "Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society." 652 A.2d at 287-89.

The Brion majority went on to address, where the Schaeffer OISA had not, Chief Justice Nix's argument in Schaeffer that Rodriguez should be controlling. The Brion majority again focused on privacy in the home: "The issue in Rodriguez, however, was not framed as it is in the case presently before us, *i.e.*, whether the Blystone rationale extends to cases involving the surreptitious recording of a conversation in a private residence. It is unclear whether Rodriguez owned the residence or even whether the conversations in fact took place in the residence." Id. at 289 n.2.

Chief Justice Nix, joined by Justice Papadakos and this author, reiterated his position from Schaeffer, citing directly to Blystone and Rodriguez. To the dissent, Brion's expectation of privacy was lost, not because he was in his home when the conversation was recorded, but because, like Blystone before him, he voluntarily

exposed his criminal conduct to another person who happened to be a wired CI: "[L]ocation is not a distinguishing factor because it was not a consideration in the original Blystone decision." Id. at 290. The dissent also reprised the argument from the Schaeffer OISR, premised upon Rodriguez, that Blystone's disclosure/risk paradigm for analyzing a reasonable expectation of privacy properly focuses on the conduct of the suspect rather than on geography. And, as in Schaeffer, Chief Justice Nix also questioned in his Brion dissent whether use of one's residence as a business, particularly a criminal enterprise, lessens the otherwise heightened expectation of privacy in one's home. 652 A.2d at 290-91.

The same viewpoints were aired again in Commonwealth v. Selby, 688 A.2d 698 (Pa. 1997), another drug trafficking case where police "sent" a wired CI into the defendant's home for a drug buy. In a short Opinion Announcing the Judgment of a six-Justice Court ("OAJC"), Chief Justice Flaherty noted that the issue was the same as in Brion: "[W]hether an informer wearing a consensual wiretap may, without a warrant, enter another individual's home to record his conversations electronically for use by the police in an undercover investigation." The facts were also virtually identical: in the course of investigating Selby for drug sales activity, police sent an informer wearing a wire into Selby's residence in order to make a drug buy. The Selby OAJC came to the same conclusion as the Brion majority: police may not send a CI into a suspect's home to covertly tape statements or conversations without first obtaining a warrant; Justices Zappala and Cappy joined the OAJC; Mr. Justice Nigro concurred in the result without writing separately. Id. at 699-700.

This author dissented, reiterating agreement with the Blystone majority/Schaeffer OISR/federal approach that wherever the encounter occurs, a person who discusses or displays criminal involvement or actions to another person takes the risk of being

revealed to law enforcement authorities, and thus abandons a reasonable expectation of privacy in the substance of the communication. Madame Justice Newman also dissented on this basis and reiterated Chief Justice Nix's dissenting view from Brion that using one's residence for a business enterprise, especially drug dealing, should negate the traditionally strong constitutional protections found in the home. Id. at 700-03.

This Court's most recent consideration of one-party consensual recordings arose in very different factual circumstances and resulted in a 4-3 decision in Commonwealth v. Rekasie, 778 A.2d 624 (Pa. 2001). In Rekasie, the CI, who was known to the defendant as a regular drug customer, agreed with police to have his telephone calls to the defendant's home intercepted, and also to wear a body wire during an encounter with Rekasie at the CI's workplace. Writing for the majority, Mr. Justice Cappy recognized the ongoing division of the Court over whether to follow the disclosure/risk approach embodied in Blystone, or the Brion approach, which holds that the home remains a "zone of privacy" strong enough to shield against purposeful but warrantless police electronic monitoring of conversations taking place inside.

The Rekasie majority characterized the best approach as a return to the subjective/objective theory expressed in Justice Harlan's concurring opinion in Katz, which was adopted in Blystone: "Justice Harlan set forth a two-fold requirement that a person: (1) have exhibited an actual (subjective) expectation of privacy; and (2) that the expectation be one that society is prepared to recognize as reasonable." The Rekasie Court concluded that neither absolutist position -- the "disclosure/risk" camp nor the "sanctity of the home" camp -- must prevail, because there is a middle ground. Rather, looking to both parts of the Harlan expectation of privacy test allows for "a construct which in this Commonwealth takes into account the circumstances of the situation surrounding the disclosure of information as well as the individual's conduct." 778 A.2d at 628-31.

Using this construct, the Court concluded that while Rekasie might have a subjective expectation privacy in phone conversations made to his home line by a known customer (who Rekasie obviously did not know was a CI), there was no corresponding objectively reasonable societal basis for the expectation: extension lines can be used to listen in, and there are many other ways in which phone conversations can be overheard and recorded. Unlike in Brion, the Rekasie majority continued, this was not a face-to-face conversation inside the defendant's home, where a greater privacy interest could be asserted. Id. at 631-32. Rekasie then tacitly followed Blystone, to the extent that it distinguished telephone calls from face-to-face encounters in a suspect's home, by considering the actions and disclosures of the suspect, rather than the physical location where the encounter or interception occurred.

In a joining concurrence, this author, joined by Mr. Justice Saylor, reiterated the view that disclosure and risk should still be part of the calculus, and that Blystone should still control. Thus, the defendant may have been physically inside his home when he made or received the subject phone calls, but those calls came from and went outside the home the moment they were made and received. There was no CI wearing a wire who walked or was "sent" into the defendant's living room, and therefore no actual violation of the accepted sanctity of the home; as such, the concurrence posited, Rekasie could not even demonstrate a subjective expectation of privacy. Id. at 633-34.

In dissent, Justice Zappala, joined by Chief Justice Flaherty, would have held that the interception was unconstitutional because it involved warrantless electronic interception of a communication transmitted from within the defendant's home. To Justice Zappala's thinking, "[o]ur right to privacy does not rise and fall with technology, but rather is grounded in our state constitution, which has afforded the right to privacy the utmost protection. . . . Rather than relinquish our privacy rights in the face of modern

innovation, we should fiercely protect them." Largely on the same grounds, Justice Nigro dissented as well, joined by the two other dissenters. 778 A.2d at 634-38.

Of course, the major difference between the foregoing line of authority and the case *sub judice* is that here we have a silent video recording, as opposed to the transmission and recording of audio statements and communications at issue in the Blystone line of cases. The parties, who have not discussed the Blystone line of cases, obviously make no effort to address whether that difference should impact the constitutional analysis. Nevertheless, research indicates that although cases specific to video "searches" are far less prevalent, the audio cases are an appropriate guidepost. Indeed, this approach has been endorsed by scholarly sources, including the seminal LaFave treatise on search and seizure. See Wayne R. LaFave, Search and Seizure: A Treatise on The Fourth Amendment 675-78 (5th ed. 2012) ("What has been said herein with respect to the use of eavesdropping-wiretapping equipment is generally true as well as to electronic visual surveillance.").[10] The federal appellate cases the Commonwealth cites in its brief engage in the same equivalent approach. In U.S. v. Davis, 326 F.3d 361 (2d Cir. 2003), the CI was instructed to come to Davis's house for a drug buy; before the CI went to the house, law enforcement personnel wired the CI for both audio and video. The circuit appeals panel saw no basis to distinguish between audio and video, concluding that the mere fact that video is more detailed and accurate than audio does not make a difference, because both are simply supplements to the CI's testimony. Id. at 366-67. In U.S. v. Lee, 359 F.3d 194 (3rd Cir. 2004), federal agents secured equipment

---

[10] This is not to deny that there can be circumstances where videotaping could be far more intrusive than audiotaping. The invasion of privacy represented by the private actors in Kean – surreptitiously placing a video camera in a couple's bedroom – is a perfect example. That potential distinction, however, is of no particular relevance to the factual circumstances here.

in a hotel room to record audio and videotape of meetings between the CI and the defendant regarding bribery and money laundering by boxing promoters; the circuit appeals panel saw no distinction between what was said by the defendant to the CI and what he allowed the CI to see.   Id. at 199-203.   And, in U.S. v. Brathwaite, 458 F.3d 376 (5th Cir. 2006), the CI used audio and video devices in her purse to record the defendant's counterfeiting of driver's licenses, checks, and credit cards.   The panel found no "constitutionally relevant difference between audio and video surveillance" because the defendant forfeited his privacy in what he said and did in the CI's presence when he invited the CI into his home.   Id. at 380-81 & n.4 (citing both Davis and Lee, as well as video cases from Sixth, Eighth, Ninth, and Eleventh U.S. Circuit Courts of Appeal). Thus, under this federal analysis at the Circuit level, it appears logical to examine audio search precedent in assessing cases involving video surveillance.

As noted, Brion did not purport to disapprove Blystone's central holding that one "cannot have a justifiable and constitutionally protected expectation" that what he reveals or discloses to another person will not be relayed to law enforcement, either by the other person's retelling or through electronic means.   549 A.2d at 87-88.   The two cases from this Court in the audio search area which produced majority mandates to suppress the audiotape – the majority opinion in Brion and the OAJC in Selby (where the fourth vote for the mandate was via a CIR vote) – emphasized that police had deliberately "sent" the CI to the defendant's residence wearing a wire; the point in those cases was that deliberate police conduct, aimed at the home, had led to the interception and ultimate revelation of the defendant's criminal conduct.

That did not occur here; and given the Court's precedent, we think this factual distinction makes all the constitutional difference.   Indeed, this case involves less purposeful police intrusion into the home than in Rekasie, where police recorded the CI's

phone calls to the suspect's home. Thus, we would find that this case is properly controlled by the focus in <u>Blystone</u> and <u>Rekasie</u> upon the deliberate nature of police conduct. Appellee presented no evidence of such conduct at the suppression hearing, and the Commonwealth's evidence to the contrary was uncontroverted. Far from knowingly and purposefully **sending** a CI equipped with a hidden camera into the suspect's home, police here sent the camera-equipped CI to a public street corner designated by appellee's conspirator in order to make a drug buy from the conspirator's "runner," appellee.[11] But appellee did not make the deal on the street corner. Instead, appellee invited the CI into his car, drove the CI to his home, invited the CI inside, and conducted the drug sale. These decisions and movements were controlled by appellee, not by the CI or the police: it was appellee's vehicle and appellee's home, and he elected to expose both to the CI. Moreover, there is no evidence in this record – nor has there been any argument by appellee here or below -- of manipulation or maneuvering on the part of police to "defeat" appellee's heightened expectation of privacy in his home. Indeed, Corporal Rubano specifically testified that he expected the drug sale to occur on the street corner designated by Lowe, and there is no indication in the record that the police knew or expected otherwise. N.T., 6/6/12, at 43.

<u>Brion</u> also relied upon dramatic language from <u>Shaw</u>: "Upon closing the door of one's home to the outside world, a person may legitimately expect the highest degree of privacy known to our society." But, in this case, we would reason that appellee did not

---

[11] There is no dispute that video surveillance of a purely public area such as a street corner implicates no special constitutional concerns. <u>See</u> LaFave, Search and Seizure, at 676 ("It is no search to videotape what a police officer is observing in a plain view situation, nor is any justified expectation of privacy violated by the videotaping of activity occurring in full public view.") (footnotes omitted).

close the door to the outside world. Both the CI and the hidden camera made their way to the front door of appellee's home, across the threshold, and into the home only as a result of appellee's invitation. At that point, appellee harbored no objective expectation that what the CI observed in the home, and what appellee chose to reveal to the CI, would remain sacrosanct.

All that is left is the fact of the hidden camera, which better and more reliably memorialized the details of the drug transaction, which had been expected to occur on a public street corner and which the CI would have been free to disclose to authorities. Blystone, 549 A.2d at 88 n.18 (quoting White, 401 U.S. at 753). But, the camera made its way into the home by way of the exigency of appellee's unexpected transportation of the CI to, and invitation into, the home; there was no intervening opportunity during this fluid chain of events for the police to secure a warrant. As such, we would conclude that there is no principled basis for exclusion of the evidence as a constitutional matter.

Our approach to this appeal should not be read as if it turns upon police "good faith," for it does not. In Commonwealth v. Edmunds, 586 A.2d 887 (Pa. 1991), evidence was suppressed despite good faith reliance by the police upon a duly-issued warrant, because the magistrate had erred in the bedrock assessment of probable cause, and the Court determined that the intrusion into privacy resulting from that governmental error warranted suppression since deterrence of police conduct alone is not the sole rationale for the exclusionary rule in Pennsylvania. From the perspective of the person suffering the intrusion, it little matters if the mistake is that of the judge issuing the warrant or that of the officer executing it. As we have explained, cases like Brion focused upon police conduct designed and intended to intrude upon – or to invite an intrusion upon -- the privacy of the home.[12] In this case, unlike in Edmunds or in Brion, there is no such

_____

[12] The first paragraph in the Brion majority opinion reads, *verbatim*, as follows: (continued…)

underlying error by police or magistrate; the "intrusion" was at appellee's invitation. The unexpected invitation by appellee was an exigency that prevented the ability of the police to secure a warrant, and the consequences should be visited upon him.

The Justices supporting affirmance do not dispute that the CI's entry into the home at appellee's invitation was lawful: nor do they dispute that the CI's observations – what the CI saw and what he heard appellee say – would not be subject to suppression. The line they draw is at the use of the hidden camera. The lead Opinion in Support of Affirmance suggests that failing to require suppression in this case amounts to a good faith exception to Article I, Section 8 (insofar as that opinion would view suppression in these circumstances to be a good faith exception to the <u>Brion</u> majority's broad language concerning the sanctity of the home). But, as noted, our approach would not adopt a good faith exception to the exclusionary rule.

Article I, Section 8, like the Fourth Amendment, protects the citizenry against "unreasonable" searches and seizures. <u>See</u> <u>also</u>, <u>e.g.</u>, <u>Commonwealth v. Revere</u>, 888

_____

(…continued)

> The controlling question in this appeal is whether, under the Pennsylvania Constitution, the police can **send** a confidential informer into the home of an individual to electronically record his conversations and transmit them back to the police. Because the right to privacy in one's domain is sacrosanct, we hold that Article I, § 8 of the Pennsylvania Constitution precludes the police from **sending** a confidential informer into the home of an individual to electronically record his conversations and transmit them back to the police. The order of the Superior Court is reversed.

652 A.2d at 287 (emphasis added). The sanctity of the home was not the entirety of the analysis, nor could it responsibly be. Indeed, if the sanctity of the home were all that mattered, the CI's observations – upon being invited into the home by appellee – would be subject to suppression.

A.2d 694, 706-07 (Pa. 2005); In re D.M., 781 A.2d 1161, 1163 (Pa. 2001). Unless application of an exclusionary rule is to be arbitrary, it must be in response to some unreasonable or improper governmental conduct. In the seminal case of Edmunds, for example, the police may have acted in good faith upon the warrant, but the warrant was itself invalid because it was not supported by probable cause; a judicial branch officer erred, causing an unlawful intrusion. In Edmunds, the Court stressed the unlawful government conduct:

> [G]iven the strong right of privacy which inheres in Article [I], Section 8, as well as the clear prohibition against the issuance of warrants without probable cause, or based upon defective warrants, the good faith exception to the exclusionary rule would directly clash with those rights of citizens as developed in our Commonwealth over the past 200 years. To allow the judicial branch to participate, directly or indirectly, in the use of the fruits of **illegal searches** would only serve to undermine the integrity of the judiciary in this Commonwealth. From the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive. This is true whether it occurs through the actions of the legislative, executive or the judicial branch of government.

586 A.2d at 901 (internal citations omitted) (emphasis added). Accord Commonwealth v. Johnson, 86 A.3d 182, 183, 187 (Pa. 2014) (suppression proper under Article I, Section 8 because warrant authorizing arrest invalid (expired)).

In this case, in our view, given the exigent circumstances, and given that there was no underlying unlawful governmental conduct, such as "sending" a CI into a citizen's home for the purpose of recording a conversation, no constitutional violation occurred. We would reverse.

Messrs. Justice Eakin and Stevens join this opinion.